**Grover William SIMS, Second Lieutenant, United States Air Force 418–66–6972-FV, Plaintiff-Appellant,**

v.

**Cecil E. FOX, Brigadier General, etc., and Dr. John L. McLucas, Secretary of the Air Force, Defendants-Appellees.**

No. 73–2707.

United States Court of Appeals, Fifth Circuit.

Dec. 30, 1974.

Reginald C. Wisenbaker, Valdosta, Ga., for plaintiff-appellant.

Hale Almand, Jr., Asst. U. S. Atty., William J. Schloth, U. S. Atty., Sam R. Wilson, Earl W. Carson, Asst. U. S. Attys., Macon, Ga., Dr. John L. McLucas, Sec. of Air Force, William Kanter, Thomas G. Wilson, Dept. of Justice, Washington, D. C., for defendants-appellees.

Before BROWN, Chief Judge, and TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

COLEMAN, Circuit Judge.

This is an action by Air Force Lieutenant William Sims against Air Force General Cecil Fox and the Secretary of the Air Force. Sims asks that the Air Force be enjoined from discharging him without first giving him a hearing in person to present proof of his fitness for continued service.

The District Court dismissed Sims' complaint for failure to state a claim upon which relief could be granted. A Panel of this Court reversed, Sims v. Fox, 5 Cir., 1974, 492 F.2d 1088. We granted the petition for rehearing *en banc*, and again consider the correctness of the dismissal.

We affirm the Judgment of the District Court.

Lt. G. William Sims was ordered to active duty on July 14, 1971. His performance of duty was good. Until June, 1972 his off-duty life was unremarkable. In that month, Sims was arrested for two separate acts of indecent exposure. Specifically, on June 20 and June 23 he was charged with exposing his sexual organs to females. He was released on bond.

In September of 1972, Mrs. Carol Barnett, a civilian, reported to military authorities that Sims on two occasions had exposed himself to her minor children, ages six, nine, and four. Sims was again charged with indecent exposure.

On 4 January, 1973, Sims was tried in a Georgia state court. Under a Georgia statute providing for special treatment for first offenders,[1] he was allowed to plead *nolo contendere* and was placed on probation for a year. Although the Georgia Court made no adjudication of guilt, Sims has never denied that he, in fact, committed the acts with which he was charged.

On January 24, 1973, Sims was notified by his Wing Commander that discharge proceedings [2] were being initiat-

---

1. 27–2727 through 27–2732, Ga.Code Ann.

2. The discharge procedure is that specified in Air Force Regulation 36–2 which provides,

ed. Sims was given 15 days in which to submit written statements and documentary evidence.

In response, Sims submitted a letter from a superior officer characterizing him as "one of my most trustworthy subordinates", a letter from a psychiatrist saying that Sims is "mentally and emotionally capable of performing his old duties and occupation", along with the Georgia court order which discharged him without an adjudication of guilt. However, Sims wrote his Commander that "this information does not deny the basic allegations against me".

Unpersuaded by the evidence submitted by Sims, the Secretary of the Air

in relevant part, that a Wing or Base Commander, having received information indicating that an officer is unfit for continued service, notifies the officer of the charges against him and advises the officer that he has 15 days within which to submit written statements and documentary evidence. If, after considering the evidence, the Commander concludes that discharge is appropriate, he forwards the documented case to Air Force Headquarters.

At Air Force Headquarters, the case is referred to the, Air Force Personnel Board which, after reviewing the evidence, makes its recommendation to the Secretary of the Air Force. The Secretary is the person who makes the final decision as to whether the officer should be retained or discharged.

The Secretary's order to discharge a serviceman is not necessarily the end of the matter. Following discharge, limited post-discharge relief is available. 10 U.S.C. § 1552 provides:

"(a) The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice. Under procedures prescribed by him, the Secretary of the Treasury may in the same manner correct any military record of the Coast Guard. Except when procured by fraud, a correction under this section is final and conclusive on all officers of the United States.

\*        \*        \*        \*        \*

"(c) The department concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section, the amount is found to be due the claimant on account of his or another's service in the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be.

\*        \*        \*        \*        \*

"(d) Applicable current appropriations are available to continue the pay, allow-ances, compensation, emoluments, and other pecuniary benefits of any person who was paid under subsection (c), and who, because of the correction of his military record, is entitled to those benefits, but for not longer than one year after the date when his record is corrected under this section if he is not reenlisted in, or appointed or reappointed to, the grade to which those payments relate. Without regard to qualifications or reenlistment, or appointment or reappointment, *the Secretary concerned may reenlist a person in, or appoint or reappoint him* to, the grade to which payments under this section relate." [Emphasis added.]

10 U.S.C. § 1553 provides:

"(a) The Secretary concerned shall, after consulting the Administrator of Veterans' Affairs, establish a board of review, consisting of five members, to review the discharge or dismissal (other than a discharge or dismissal by sentence of a general court-martial) of any former member of an armed force under the jurisdiction of his department upon its own motion or upon the request of the former member or, if he is dead, his surviving spouse, next of kin, or legal representative. A motion or request for review must be made within 15 years after the date of the discharge or dismissal.

"(b) A board established under this section may, subject to review by the Secretary concerned, change a discharge or dismissal, or issue a new discharge, to reflect its findings.

"(c) A review by a board established under this section shall be based on the records of the armed forces concerned and such other evidence as may be presented to the board. A witness may present evidence to the board in person or by affidavit. *A person who requests a review under this section may appear before the board in person or by counsel or an accredited representative of an organization recognized by the Administrator of Veterans' Affairs under chapter 59 of title 38.* As amended Pub.L. 87–651, Title 1, § 110(a), Sept. 7, 1962, 76 Stat. 509." [Emphasis added.]

Force ordered Sims honorably discharged.

The exact terms of the discharge are important. At the time Sims was notified of his prospective discharge and at the time the Panel heard Sims' appeal, Air Force regulations provided that the discharge certificate (DD Form 214) would contain a code [3] which, upon inquiry, would reveal that Sims was discharged because of "fail[ure] to meet the standards of conduct and performance prescribed by the Secretary of the Air Force",[4] and would further reveal that the discharge was related to Sims' "unfitness, unacceptable conduct or in the interest of national security." [5] As the Panel observed,

> "Simply stated, an honest inquiry into the basis for Sims' discharge would demonstrate that [Sims] had been given a discharge for reasons that would greatly undercut the status of the discharge as 'an honorable discharge.' . . . There can be no doubt but that Sims' discharge [would be] a flawed passport back to civil[ian] life." 492 F.2d at 1091.

Since the rendition of the panel decision, there has been a significant change in Air Force regulations. They now provide that the code explaining the reason for discharge will not be put on the discharge certificate.[6] The certificate "on its face" does not reveal the reason for discharge. Furthermore, the regulations specify that narrative reasons for discharge can be obtained only by a former "member furnish[ing] the original DD Form 214 for the period of service for which he desires the narrative reasons for separation".[7] As explained by Air Force correspondence, "narrative reasons for separation are to be furnished only to the member and then only upon his request and provided the member can furnish the original DD Form 214." [8]

Sims' contention is that notwithstanding the honorable character of the discharge and notwithstanding the fact that there is nothing on the face of the discharge paper (DD Form 214) to indicate the reason for discharge, he is entitled to a pre-discharge hearing. Sims says that the Air Force, by discharging him on the ground of sexual deviancy, is denying him "liberty" and "property" and he is therefore entitled to the "due process" guaranteed by the Fifth Amendment.

Sims raises these claims despite 10 U. S.C. § 1162 which provides that a reserve officer such as Sims may be discharged "at the pleasure of the President".

I. *The Property Claim*

■ Sims first claims that he has a "property right" in continued employment in the Air Force. In his brief, Sims says that the property right is conferred by his "expectation of a full tour of duty", by "an implied promise . . . of continued service . . .", or by an "understanding" between himself and the Air Force.

A substantially similar claim was considered in Board of Regents of State College v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In that case, a non-tenured state college professor claimed, *inter alia*, that the State's refusal to renew his contract was a deprivation of his "property" and that he was therefore entitled to a pre-discharge hearing. The Supreme Court responded that a non-tenured professor, who was given no right to contract renewal either by state law or by expressed or implied terms of his contract, had no property interest in continued employment.

---

3. 5DN 588 Par. 37 AFR 36–12.

4. Air Force Regulation 36–12.

5. Air Force Regulation 36–12.

6. Air Force Regulation 35–6, ¶ 4–5, effective 1 May 1974.

7. Air Force Regulation 35–6, ¶ 4–6, effective 1 May 1974.

8. Official Air Force Correspondence 252100Z dated April, 1974.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.

\* \* \* \* \* \*

"[The] terms [of plaintiff's appointment] secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent 'sufficient cause.' Indeed, they made no provision for renewal whatsoever.

"Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." 92 S.Ct. at 2709–2710.

The present facts are similar to those in *Roth* in that there is nothing in Sims' contract or in any statute creating a right to continued employment. The statute specifically negates the right of a reserve officer to continued employment; reserve officers may be discharged "at the pleasure of the President", 10 U.S.C. 1162. Thus, the statute explicitly provides that one has no vested right to continue in the employment of the United States Armed Forces. One who may be discharged "at the pleasure" of another; i.e., arbitrarily, for no cause whatsoever, simply has no property right to continued employment. The statute could not have expressed that proviso in any more specific terms.

Apparently recognizing that the source of his alleged property right to employment cannot lie in the statute, plaintiff claims he is given such a right by "understanding" or "implied promise". That a property right may spring from such a source is supported by language in *Roth, supra,* and also by the holding in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In the latter case, a non-tenured professor complained, *inter alia,* that he had been deprived of "property" because his contract had not been renewed. There was no statute and no contract that gave him a right to contract renewal. Rather, the plaintiff argued that the college had a "de facto" tenure policy. This policy was expressed in the college's faculty guide which provided:

"*Teacher Tenure*: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." 92 S.Ct. at 2699.

Additionally, plaintiff there relied upon guidelines published by the state college board indicating that a person who had been employed as a teacher enjoyed a form of tenure.

These "policies and practices" of the school and the Board of Trustees, the Court said, could create a property interest. It was not necessary that an employment contract or a statute specifically create the interest.

The *Perry* case supports plaintiff's argument in the sense that it indicates that there is no rigid limit to the sources of property rights. Such rights may be derived from statutes, from explicit contracts, or, as was true in *Perry,* from state declared policies.

But there are still limits on those things that can be considered "property rights". There must be some reasonably

identifiable source from which the rights spring; they cannot emanate, as was said in *Perry*, from "mere subjective expectancy", 92 S.Ct. at 2700. The law still recognizes the immutable notion that something cannot spring from nothing. One cannot create for himself a property by proclaiming its existence.

In this case, Sims says he has a property right to continued employment, but he can point to nothing other than his own expectancy for the creation of that right. No statute created it; indeed, the statute expressly denied its existence. Neither has Sims pointed to any express terms in his contract or to any governmental regulation that might have led him to believe he had such a right. An Air Force contract or regulation cannot grant that which Congress has specifically withheld. The Air Force must act within the authority delegated to it by Congress or, in certain cases, by the President. Any "regulations" or "contracts" attempted in excess of that authority would be void. .

Sims has no property right in continued military employment because there is no source for it other than his own "expectancy". The applicable statute specifically denies the right.

## II. *The Liberty Claim*

Appellant's second theory is that the Air Force action under the circumstances of this case deprives him of "liberty". The "liberty" allegedly taken is his "good name, reputation, honor, and community standing". In this respect Sims' contention is less convincing than when the Panel originally decided his appeal. At that time, appellant's prospects were that he would, receive a discharge paper (Form DD 214) which on its face would contain a code which, upon inquiry or investigation, would reveal that he had been discharged for "unfitness, unacceptable conduct, or in the interest of national security".[9]

The Air Force no longer uses the code which would have revealed the reason for his discharge. The discharge paper which he is now about to receive will not reveal the reason for the discharge. Moreover, Air Force regulations prescribe that reasons for the separation are to be furnished only to the serviceman.[10]

Thus, as Air Force regulations now stand, appellant will receive an honorable discharge which will not indicate the reason for the discharge. Persons outside the military can obtain the reason for discharge only in the remote event that the Air Force disregards its own regulation. His contention that his liberty interest is infringed by Air Force action is therefore necessarily reduced to a possibility that the Air Force might allow the derogatory information to "escape".

■ It is, of course, established law that a governmental attack on one's "good name, reputation, honor, and community standing" can be a deprivation of "liberty", within the meaning of the Fifth and Fourteenth Amendments. This was the holding in Wisconsin v. Constantineau, 400 U.S. 433, 436–437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), which involved the constitutionality of a Wisconsin statute allowing specified governmental officials to post in public establishments the names of persons who were not to be sold intoxicating liquors. The Supreme Court held this statute to be an unconstitutional denial of "liberty" since the persons whose names were posted were exposed to public embarrassment and ridicule. One's "good name, reputation, honor, and community standing" cannot be taken from him, the Court said, without a hearing in which the truth of the posted matter may be tested.

A more recent Supreme Court pronouncement that "liberty" is lost when one's "good name, reputation, honor, and

---

9. Air Force Regulation 36–12.

10. Air Force Regulation 35–6, ¶ 4–6, effective 1 May 1974.

community standing" are falsely attacked is found in *Roth, supra,* where the Supreme Court held, *inter alia,* that plaintiff (a non-tenured school teacher whose contract was not renewed) was not denied "liberty" within the meaning of the Fourteenth Amendment since the non-renewal of his contract was not based upon any charge which

> "might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case.
>
> \*   \*   \*   \*   \*   \*
>
> "Similarly, there is no suggestion that the state, in declining to reemploy the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. . . ." 92 S.Ct. at 2707.

■ In brief, *Roth* teaches that the government's attack on one's reputation may infringe constitutionally protected liberty in two respects: (1) governmental degradation of one's standing in his community may be a denial of "liberty"; (2) governmental communication of derogatory information to employers may be an attack on "liberty".

■ Under the first test, plaintiff's reputation in his community has not been attacked. The community in which plaintiff will live after discharge can be expected never to know from public records of the circumstances of his discharge.

As to the second, Air Force regulations specifically deny that employers, or anyone else, can learn of the circumstances of the discharge. In the absence of allegations indicating a reasonably anticipated likelihood that the Air Force, notwithstanding its regulations to the contrary, would reveal plaintiff's record to potential employers, the complaint is purely speculative.

Infringement of "liberty", as defined in the *Roth* guidelines, is not, on substantial possibility, involved in this case.

■ Thus the case is reduced to whether the mere presence of derogatory information in an employer's confidential files is an infringement of liberty.

Arguably, the very presence of derogatory information in an employer's confidential records infringes protected "liberty" since it denies a person the freedom he otherwise would have to use his record for his own benefit by voluntarily making it available to future employers. The contrary argument would be that the harm suffered by the mere presence of damaging information in a confidential file is not substantial enough to amount to an infringement of "liberty" in the constitutional sense. In this Circuit the law on that subject is settled. In Collins v. Wolfson, 5 Cir., 1974, 498 F.2d 1100, 1104, state university teachers made various claims that the state university for which they worked was depriving them of "liberty" within the meaning of the Fourteenth Amendment "due process" clause. The claim of three of the teachers was that constitutional rights were violated because school officials had placed unfavorable memoranda in their files concerning their activities on behalf of a teachers' union. This Court summarily disposed of the teachers' claim saying that "lodging these memos, without more, in the instructors' respective files gives rise to no constitutionally based grievance". The mere presence of derogatory information in *confidential* files is not an infringement of "liberty".

Additionally, it is not to be overlooked that Sims has not denied the truth of the charges against him. In his letter to his commanding officer, Sims stipulated that "this information does not deny the basic allegation". As his counsel explained at the *en banc* hearing, Sims seeks an Air Force hearing not to refute the charges but only to present mitigating considerations. That makes this a case in which appellant claims that constitutionally guaranteed liberty is infringed because the government is about to put the undenied truth in its own records. This need not long detain us.

In the recent decision, Arnett v. Kennedy, 416 U.S. 134, 164, 94 S.Ct. 1633, 1649, 40 L.Ed.2d 14 (1974), the Supreme Court refers to an employee's "liberty" right as being the right to be free from being *"wrongfully* stigmatized by untrue and *unsupported* administrative charges".

■ In conclusion, we hold, as basic propositions, (1) that liberty is not infringed by the *mere presence* of derogatory information in *confidential* files and (2) the government has not infringed "liberty" unless it perpetuates *untrue* charges. Thus, in the absence of a denial of the truthfulness of the allegedly offending material, there is no necessity for a hearing; there is no disputed fact requiring resolution as the result of a hearing.

For the foregoing reasons we think the dismissal of the complaint must be allowed to stand, making it unnecessary to discuss the case in the light of Hodges v. Callaway, 5 Cir., 1974, 499 F. 2d 417 (exhaustion of administrative remedies) or Arnett v. Kennedy, 1974, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 14 (post discharge evidentiary process sufficiently protected "liberty" interest).

The Judgment of the District Court is Affirmed.

TUTTLE, Circuit Judge, with whom WISDOM, BELL, GOLDBERG, GODBOLD and MORGAN, Circuit Judges, join (dissenting):

With utmost deference to the views of my colleagues I am constrained to dissent.

I do so because I am fully convinced that Lt. Sims has a "property" right and a "liberty" right, as these terms are discussed in the majority opinion, to be protected under the Fifth Amendment to the Constitution. As I read the majority opinion, it holds that he has neither; it precludes this officer from ever claiming the right to a personal appearance, either before or after discharge, to undertake to convince those in authority that, instead of being discharged for immoral conduct, his potential as an Air Force officer is such as to warrant his retention in the service until the normal expiration of his tour of duty. This follows, it seems to me, because the Court holds that he has neither a property nor a liberty interest to protect, and without either he, of course, has no claim to procedural due process.

Because the opinion does not deal with the exhaustion of administrative remedies, I refer only to what has been said with respect to this in the panel opinion, calling attention, however, to that part of footnote No. 2 of the majority opinion, which cites 10 U.S.C.A. § 1553 and which italicizes the language *"a person who requests a review under this section may appear before the board in person or by counsel or an accredited representative of an organization recognized by the Administrator of Veteran's Affairs* under chapter 59 of title 38." I comment on this because, as stated in the panel opinion, and as conceded at all times by the Government, the provisions of § 1553 do not permit the board created thereunder to reinstate an airman or officer, once he has been discharged. I am concerned lest the italicizing of the above language may inadvertently convey the impression that such a right is available after discharge.

Of course, as also commented on in the panel opinion, and as conceded by the Government, § 1552 under which the Secretary *may* reinstate an officer, does *not* guarantee a personal appearance of a discharged airman or officer, seeking to have his discharge revoked.

It is unnecessary to repeat the facts that led to the filing of this lawsuit. It seems fair to assume for the purpose of this opinion that the majority would recognize that Lt. Sims is being deprived of a "liberty" right, protected by the due process clause of the Fifth Amendment, were it not for the change in regulations instituted by the Air Force since the filing of this action. The majority concludes that the change has the effect of keeping hidden the reason for

discharge because the Air Force merely retains information that Sims has been discharged for the reasons outlined in paragraph S 4D(4) of Air Force Regulation 36-2 solely within its own confidential files.

The opinion of the Court comments on the fact that under Air Force Regulation 35-6, paragraph 4-6, effective 1 May 1974,[1] only the Air Force itself, and the officer, at his own election, will now have the damaging information as to the "reason for discharge."

With deference, I feel constrained to say that this theory of denying Lt. Sims a hearing with minimal due process is based upon what I consider to be the erroneous theory that what the officer and the courts should be concerned about is to keep from potential future employers the truth of the facts leading to Lt. Sims' discharge. This, it seems to me, is to place principal emphasis on the cosmetic effect of the new form of entries on the officer's discharge certificate rather than to place it on the question whether he is entitled to have procedural due process before the Air Force takes the *action*, based on the unsavory factor. I would assume that this Court would expect a former officer of the United States Air Force, when asked by a prospective employer what was meant by the two dash marks that are now entered in all discharge certificates opposite the entry "reason for discharge" would tell the truth. Failure to do so would be a fraud on a prospective employer. For Lt. Sims to answer this question under the proposed action of the Air Force, he would in honesty, be compelled to say "I was discharged for the reasons spelled out in Air Force Regulations 36-2 as outlined in paragraph 4(d)(4) of that Regulation." Then, upon being asked what is meant by that, he would have to say "Sub-paragraph (d)(4) is entitled 'sexual perversion' and it reads 'this includes but is not limited to . . . (4) indecent exposure.' " The fact that this language is not "communicated" by the Air Force to prospective employers, either by having it inserted, as it was previously, on the discharge certificate at the time this lawsuit was filed, or in response to requests by future employers, makes no difference.

Lt. Sims has to live the rest of his life with his military record. The question before this Court, it seems to me, is whether his military career should be terminated by the Air Force forcing on him a discharge on the grounds of immoral conduct without his being afforded any procedural due process to explain away or overcome the effects of his misconduct. The wound resulting from a denial of an opportunity to this officer to have such a hearing is much more than skin deep. It goes to the vitals of his future career.

Of course, this Court would not pretend to prejudge the result of a proper hearing, if one were accorded to Lt. Sims. If the Air Force, after according him whatever rights he is entitled to under our concept of procedural due process, determines that no matter how much rehabilitation has been, or can be, achieved, and no matter how satisfactory his military record may be, his acts were such as to render him unfit to continue service in the Air Force, then he

---

1. This document appears to be an interim modification which states on its face that it is "effective 1 May 1974 and pending receipt of formal printed change," in AFM 35-6. In fact we have been supplied with what appears to be the printed change in Air Force Regulation 35-6 dated 3 July 1974, which makes it clear that the regulation change cited in the opinion for the proposition that Air Force Regulations "prescribe that reasons for the separation are to be furnished only to the serviceman" do not apply at all to an original discharge certificate. They deal only with *modified* discharges given at the request of an enlisted man or officer, seeking to have his previously obtained discharge certificate modified by having the SDN code numbers eliminated. We have been furnished with no regulations, so far as I am aware, that so strictly limit the giving of information as to either a narrative statement for the "reason of discharge" or the code numbers that lead inevitably to the same result.

would have to live with the discharge certificate given him as a result of such misconduct and that would be the end of the matter. His only hope, and it is a hope that seems to justify the Court's intervention, is that before he is discharged for any reason challenging his "good name, reputation, honor, or integrity" he is entitled to such due process as we have described in the panel opinion. He should have an opportunity to be present and make an effort to persuade the appropriate officials that such circumstances as he wishes to bring before them demonstrate that he has sufficient potential to make him a proper and suitable officer to remain in the service until the end of his normal tour of duty. Under such circumstances, of course, he would then receive a discharge certificate designating normal termination of service, and this would be his passport back to civil life.

However, the impression conveyed by the majority opinion that the unsavory information designated by SDN 588, signifying a discharge on the ground of "unfitness and/or unsuitability," is kept a closely-guarded secret within the Air Force headquarters is not, in my opinion, borne out by the appropriate regulations, as amended on July 2, 1974. These amended regulations do away with the former requirement that, at the proper space following the item "reason for discharge" an entry be made which, when traced to the appropriate Air Force regulations, clearly gives the reason for the discharge. As heretofore pointed out this code number in Lt. Sims' case was 588, and it was a clear statement of the reasons for discharge. Under the new regulations, no SDN entry is made on the original discharge certificate which is given to the officer himself. Instead, this space is filled with two dash marks. However, there are a total of eight copies of this discharge certificate provided for under these amended regulations. Copy no. 2 is the master personnel record copy, and it presumably remains at Air Force Headquarters. However, copies numbers 6 and 8 are sent to other interested parties. Regulations provide that copy no. 6 is to be "forward[ed] to NG ANG PMO WASH DC 20310, for review and transmittal *to the appropriate state adjutant general.*" [Emphasis added.] Copy no. 8 is required by regulations to be "forward[ed] to USAF RECTG SVC Randolph AFB TX 78148." (This is clearly the U.S. Air Force Recruiting Service, Randolph Air Force Base, Texas.)

The Government does not in any way seek to minimize or conceal the fact that these copies, containing the SDN designation are sent to the Air Force Recruiting Service Headquarters and to the State Adjutant General of the officer's home state, nor is any effort made to conceal the reason for this action. The reason is perfectly clear, but it is one which has largely escaped the attention of the Court, other than the comment in the original panel opinion calling attention to the fact that the discharge given to Lt. Sims will carry a designation which makes him *ineligible ever to return to service in the Air Force, the Air Force Reserve, or the Air National Guard.* In the truest sense of the word he will have been "blacklisted."

It is not the fact that the adjutant general of the state of the residence of the airman or officer, (who incidentally, is a state official, and who may share the unsavory record concerning the officer with the state's personnel computer, so far as the record discloses) that concerns me the most. It is the *purpose* for which this information is transmitted to the state adjutant general and to the Air Force Recruiting Service.

Any recruiting officer or state adjutant general who might, at some future date be inclined to yield to Lt. Sims' request that he be permitted to serve in the National Guard or reserve forces of the United States Air Force as an enlisted man or officer in time of peace or on active duty in time of national emergency will now have been permanently forbidden to do so as the result of this discharge, based as it is on Air Force

Regulation 36–2 pursuant to AFR 36–12 SDN 588 and the code number determining him to be unfit for further recall.

This lifetime bar to future opportunity to participate in a potentially lucrative profession, either full-time, or as a part-time activity,[2] it seems to me, brings the case squarely within the exception noted in the *Roth* case, relied on in the majority opinion. For instance, the opinion contains the following quote from *Roth*. "[The Board of Regents] did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty or immorality. *Had it done so, this would be a different case.*" [Emphasis added.]

Also quoted is the following. "Similarly, there is no suggestion that the state, in declining to re-employ the respondent, *imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other* employment opportunities. . . ." [Emphasis added.]

Here, of course, the Air Force did base Lt. Sims' discharge "on a charge . . . that he had been guilty of . . . immorality." Furthermore, it is clear that in discharging Sims the Air Force "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities . . . ."

This is a wholly separate matter from that discussed in the majority opinion, dealing with Lt. Sims' opportunities to obtain jobs in the commercial world which, the Court seems to consider unimpaired because his discharge certificate does not on its face carry the pejorative words or code number.[3]

If there can be any doubt about the nature of the "liberty" right of Lt. Sims which is here threatened, after reading the exception stated in *Roth, supra,* the following language from that opinion would, it seems to me, dispel any doubt. Immediately following the language: "the state, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities," [4] the court said "had it done so, this, again, would be a different case for '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . .' Joint Anti-Fascist Refugee Committee v. McGrath, *supra,* 341 U.S. at 185, 71 S. Ct. at 655 (Jackson, J., concurring). *See* Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131. The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities 'in a manner . . . that contravene[s] . . . Due Process,' Schware v. Board of Bar Examiners, 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, and, specifically, in a manner that denies the right to a full prior hearing. Willner v. Com-

---

2. There is, of course, the further substantial question whether by such action the Air Force can deprive this officer permanently from exercising the right common to every citizen of offering his services by way of military duty, from purely a sense of obligation, without any due process hearing. Removal of such a disqualification, which if imposed by legislative act, would be a "bill of attainder" prohibited by the Court, Art. 1, § 9, Cl. 3, might well be one of the rights, hoped to be protected by an officer permitted to appear in person before a hearing board.

3. Not a word is said in the Roth illustrations about "communication" of this stigma to the community. The Court speaks to the Board's *action* as not being based on charges affecting his character. The Court, as I read its language, says that if the Board of Regents had *based its non-renewal* of teacher's contract on such a charge, "This would be a different case." So, too, in the second quotation, the Air Force is imposing on Lt. Sims a stigma or other disability that will "foreclose(d) his freedom to take advantage of other employment opportunities", i. e. to follow his desire to participate in the future in the reserve or National Guard programs of the Air Force, and since the state adjutant general is a recipient of the coded discharge, from any other state or military activities.

4. Here it did invoke regulations to effectively bar Sims from all public employment in the military services of the United States and of his own state.

mittee on Character, 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224. *See* Cafeteria Workers v. McElroy, *supra,* 367 U.S. at 898, 81 S.Ct. at 1750. In the present case, however, this principle does not come into play." Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548.

Although I feel that the strength of Lt. Sims' position with respect to the protection of his liberty right is sufficient to warrant the Court's intervention with this proposed discharge until he has had minimal due process I think some comment is proper with respect to the existence of a property right, also.

I have no doubt that the arbitrary determination by the military officials involved that Lt. Sims shall be forever barred from further military service in the United States, without a hearing or proceeding that in any way approximates a trial is just as much a deprivation of a property right as would be the action of a board of bar examiners to deny an individual the right to a certificate to practice law on constitutionally suspect grounds. *See* Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 and Willner v. Committee on Character, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. As to its deprivation of such a right, the Court, in language quoted with approval in *Roth,* said: "a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities 'in a manner . . . that contravene(s) . . . Due Process,'" Schware v. Board of Bar Examiners, 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796. How can Lt. Sims' black listing from all future military service for state or nation be distinguished?

In sum, I think that Lt. Sims' liberty is threatened both as to his potential for all future employment opportunities, regardless of the absence of the unfavorable entry on the face of his discharge certificate. I think this is clearly implied in the language quoted from the *Roth* opinion. I also think that his liberty and property rights are both threatened by the attainder against his ever having the right to serve in the state or federal military forces. The authority of the President to discharge an officer at his pleasure does not, it seems to me, extend this right to bar him from competing with all other citizens in the future to serve his country in the Air Force, without some kind of trial or hearing with minimal procedural due process.

