**Joseph S. NEAL**

v.

**SECRETARY OF the NAVY and Commandant of the Marine Corps.**

Civ. A. No. 76–3326.

United States District Court,
E. D. Pennsylvania.

June 21, 1979.

---

Harvey L. Anderson, Philadelphia, Pa., for plaintiff.

Lt. Gary J. Elkins, JAGC, Dept. of the Navy, Washington, D. C., Joseph M. Gontram, Asst. U. S. Atty. (E.D.Pa.), Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case, arising in a military setting, raises a number of interesting questions of federal jurisdiction and of administrative and constitutional law as respects the "right" of a serviceman to reenlist in the armed forces. Plaintiff Joseph S. Neal ("Neal") is a former gunnery sergeant in the United States Marine Corps who, at the time of his discharge, had served more than 14 years on active duty. Not counting several routine enlistment extensions, Neal had received permission to reenlist twice: once on November 18, 1964, and again on October 24, 1970. However, when Neal was honorably discharged from the Marine Corps on December 23, 1974, he was assigned the reenlistment code RE–3C, which bars reenlistment absent permission from the Commandant of the Marine Corps. The reenlistment bar was imposed in spite of Neal's efforts to reenlist as he had done in the past. This lawsuit, which names as defendants the Secretary of the Navy and the Commandant of the Marine Corps, is based upon a series of events triggered by Neal's unsuccessful efforts to reenlist, and seeks as relief an order that Neal be reinstated in the Corps with retroactive promotions and backpay. There being no genuine issue of material fact, it is properly before us on cross-motions for summary judgment.

Neal commenced this action on October 26, 1976 in the form of a petition for a writ of mandamus to compel the Board for the Correction of Naval Records ("BCNR") to exercise jurisdiction which it had theretofore declined to exercise. Specifically, Neal asked us to compel the BCNR to act upon his request for review of the decision by the Commandant, in accordance with the recommendation of the Marine Corps Enlisted Performance Board ("EPB"), not to permit him to reenlist. In due course we ordered the BCNR to decide the matter.[1] The BCNR then reviewed Neal's request, and on April 5, 1978 it informed him that it would let stand the reenlistment bar because there

---

1. Neal sued after receiving notice from the BCNR on June 24, 1976 that it would not exercise jurisdiction over his case. Then on March 17, 1977, after reconsideration, the BCNR agreed to review Neal's case, and we retained jurisdiction pending administrative action. On August 19, 1977 we entered an order directing the BCNR to decide the case by September 7, but after conference with counsel that date was extended by consent.

was "insufficient evidence of error or injustice to warrant any corrective action."

Having received this unfavorable decision, Neal amended his complaint and now challenges the refusal to permit him to reenlist on several grounds. First, he contends that the EPB recommendation was invalid because the Board failed to comply with prescribed regulations and procedures, and because no subsequent action taken by the Corps was sufficient to cure these errors. Second, he claims that the EPB decision and the BCNR failure to correct it were so arbitrary and capricious as to constitute an abuse of agency discretion. Finally, Neal contends that the regulations and procedures governing both Boards do not comport with the requirements of procedural due process, and that as a result defendants' actions violated his constitutional rights. To remedy these alleged violations, Neal seeks orders directing that he be reenlisted in the Marine Corps as of the date of the expiration of his prior term of enlistment, that all documents pertaining to the decision to bar his reenlistment be destroyed or sealed, and that he be accorded backpay and retroactive promotions.

Defendants as a preliminary matter, and in light of the changes in the posture of the case since the time of its inception, challenge our subject matter jurisdiction. Second, they deny that there were any irregularities in the EPB proceedings or that either Board acted arbitrarily in Neal's case. Third, they urge that the Commandant's decision was a discretionary one which we have only very limited power to review. Finally, defendants contend that the Commandant's denial of permission to reenlist impinged upon no liberty or property interest of Neal's, and that without any such interest the constitutional requirements of procedural due process do not apply. Alternatively, defendants argue that to the extent that those requirements do apply, they were followed in Neal's case.

As will appear from the discussion which follows, we hold that defendants' actions with respect to Neal comported with all applicable statutes and regulations and that they were within the bounds of agency discretion. We also hold that Neal had no protectible property or liberty interest in reenlisting, so that defendants' actions did not implicate any of his Fifth Amendment due process rights. However, before discussing the substance of the parties' contentions and several underlying issues, we must first describe more fully the factual background.

## II. The Facts and Procedural History of the Case

Neal enlisted in the Marine Corps on May 18, 1960, and served on active duty until he was honorably discharged on December 23, 1974. It is undisputed that his overall service record was "above average to excellent," and particularly outstanding during his last four years of service. See EPB transcript. He served in Cuba in the early 1960s, and was decorated for his actions during two tours of duty in combat in Viet Nam. He also received the Good Conduct Medal on four occasions for conduct denoting "honesty and faithful service in keeping with the highest traditions of the Marine Corps."

The Corps' recognition of the high quality of Neal's performance was manifested not only through various awards and consistently high efficiency ratings, but also through his promotion to the rank of gunnery sergeant (E–7) in July of 1973 and his appointment to recruiting duty in February of 1974 which, in the words of the Commandant, "[was] in itself evidence that [Neal's] record [was] one of the Corps' finest. See Correspondence of February 18, 1974 to Neal from C. W. Hoffman, by direction of the Commandant. Each of these actions in recognition of Neal's service might have required an extension of Neal's enlistment; the recruiting duty would have been for a period in excess of his current enlistment term, and in connection with his promotion, the Corps required him to execute an agreement to reenlist for a period of two years at the end of his current enlistment term.

On May 15, 1974, with his term of enlistment due to expire in several months, Neal

submitted a routine request for reenlistment. Pursuant to standard Marine Corps procedure, Neal's request was referred to the EPB, which was charged with the responsibility of reviewing and making recommendations on all such requests.[2]

On August 22, 1974, Neal's Commanding General received a letter from the office of the Commandant, advising him that Neal's request had been referred to the EPB, and directing him: (1) to inform Neal of the likelihood that in conjunction with its review of his request, the EPB would consider two reports by the Naval Investigative Service ("NIS") dated 9/18/72 and 1/8/74 respectively, which were contained in Neal's file; (2) to inform Neal that the EPB would consider any written statement by Neal concerning these reports, provided that it was forwarded to Headquarters prior to September 11, 1974; and (3) to have Neal evaluated by a psychiatrist to determine his fitness for continued service. Accordingly, Neal was informed that the EPB would consider two NIS reports in his files and that he could submit his own statement regarding the incidents covered by those reports. However, both Neal's and his Commanding Officer's efforts on Neal's behalf to obtain more information concerning the contents of the NIS reports were unavailing. Neal nevertheless did write a statement for submission to the EPB, and it was forwarded along with the requested psychiatric evaluation.

On October 16, 1974 the EPB convened to consider Neal's reenlistment request. The following materials were presented to the Board for its consideration: (1) Neal's official Enlisted Personnel File; (2) NIS investigative reports showing: (a) that in 1970 Neal had been interviewed concerning his knowledge of suspected homosexual activity on the part of another Marine; (b) that in 1972, while Neal was stationed in Okinawa, there was a brief investigation into allegations by another Marine that Neal had made homosexual advances toward him, but that the investigation was soon dropped; and (c) that in 1974, acting on a complaint by a young man, California police had arrested Neal for assault with a deadly weapon, sodomy, and sexual perversion involving oral copulation, but that the charges were subsequently dismissed when the alleged victim failed to appear for trial;[3] (3) Neal's reenlistment request and the accompanying endorsement of his Commanding Officer;

---

**2.** *See* Precept for the Enlisted Performance Board promulgated by the Commandant on October 26, 1973. According to that document, the Board's function is to consider and make recommendation upon a variety of personnel matters, including the enlistment and reenlistment of all officers and former officers, requests for service beyond 20 and 30 years, remedial and meritorious promotions, and review of records of each Marine whose name is presented to the Board as having engaged in some form of "substandard" conduct. The precept also sets forth the composition of the Board, some of the procedures by which it operates, and the method by which it communicates its recommendations to the Commandant. The Commandant than takes action in each case, either approving or disapproving the recommendations of the EPB.

**3.** The first NIS-investigated incident took place at Camp Lejeune, North Carolina. The investigation of this incident apparently consisted of one interview only. The NIS file on the Okinawa incident includes, *inter alia*, a written statement by the alleged victim of Neal's advances and summaries of an interview with him and of at least 3 separate interviews with Neal. No charges concerning the Okinawa incident were ever filed against Neal, and the investigation was apparently dropped after several months. The NIS did not conduct an independent investigation of the California incident, rather, it incorporated the California police reports into its files. One of these California police reports stated, without reference to date, time, reporting officer, disposition or any other specifics, that "Neal had been contacted by the Oceanside Police Department on two occasions when he was drunk," and the EPB incorporated this statement into its transcript. The NIS file reflects the fact that although the California case against Neal proceeded through a finding of probable cause at a preliminary hearing, it was subsequently dismissed when the complainant failed to appear for trial.

Neal has repeatedly denied all of the accusations against him, and in fact none of the accusations was ever proven. Nevertheless, the EPB summarized the 3 NIS reports as follows: "[Neal's] record reveals that on three occasions he has either been linked with homosexual activities or allegedly actively engaged in the same."

(4) a copy of a psychiatric evaluation of Neal by Dr. R. Aitken, finding him fit for further duty, with no sign of thought disorder; (5) Neal's own written statement concerning the Okinawa and California incidents which were the subjects of the NIS reports;[4] and (6) the Precept for the EPB. *See* Exhibit 1 to Defendants' Motion to Dismiss or for Summary Judgment (affidavit of Col. William E. Riley, Jr.). Neal did not appear personally before the Board, nor were any other witnesses heard.

The EPB, finding that Neal's personal conduct over the previous five years had been "prejudicial to the Marine Corps and not in keeping with the high standards expected of staff noncommissioned officers," recommended against reenlistment, and on November 12, 1974 the Commandant approved this recommendation. On November 20, 1974 Neal was so advised by letter, and on December 23, 1974 he was discharged from the Corps with an honorable discharge, and with a reenlistment code of RE-3C.[5]

On June 11, 1976, after receiving copies of his personal record and "releasable NIS reports,"[6] Neal, through his attorney, petitioned the BCNR for correction of his records. Specifically, he asked the Board to alter his assigned code so as to enable him to reenlist. On June 24, 1976 the BCNR declined to exercise jurisdiction over Neal's case, stating that it was without authority to review or change reenlistment codes. Neal then instituted this lawsuit on October 26, 1976 to compel the BCNR to consider his case, and on March 17, 1977 the Board reversed its previous position and agreed to do so.[7]

A panel of 3 members of the BCNR met on April 4, 1978 to consider Neal's application. Documentary material before the Board included Neal's application and his counsel's brief in support thereof, the EPB precept and transcript, Neal's Marine Corps record, and several advisory opinions which had been solicited by the Board, responding to the legal issues raised by Neal's counsel.[8]

In a 2–1 decision the BCNR decided to deny Neal's application without a hearing,[9] and Neal was so informed by letter following day. In that letter, the Board advised Neal that the determination whether or not an individual meets reenlistment standards was a matter peculiarly within

---

4. Neal prepared this statement after being advised that NIS reports would be considered by the EPB, but without any opportunity to see those reports. He was, however, given the dates of 2 of the 3 NIS reports that the Board subsequently considered, and he did correctly surmise the general subject matter of those 2 reports, *viz.*, the Okinawa and California incidents. Neal apparently did not surmise the subject matter of the third NIS report considered by the EPB, *viz.*, the Camp Lejeune investigation into suspected homosexual activity on the part of another Marine. The EPB described Neal's statement as an attempt to "justify his actions, clear his name, and establish his manhood."

5. Specifically, the letter stated that Neal was to be processed for discharge "by reason of convenience of the government," citing paragraph 6012.1f(9) of the Marine Corps Separation and Retirement Manual and the letter itself as authority. The cited paragraph provides that the Commandant may authorize or direct discharge as the result of action by a Marine Corps EPB. The assigned reenlistment code can be entered only at the direction of the Commandant, and bars reenlistment except by authority of the Commandant.

6. Neal was not furnished with complete copies of the NIS reports at this time, nor was he told what was omitted. Significant among the materials not furnished at this time was the Oceanside, California police report, which had been incorporated into the NIS report and considered by the EPB.

7. Specifically, the Board agreed to consider and review the actions that formed the basis for Neal's discharge, but it still maintained that it was not its policy to consider or alter the discretionary assignment of the reenlistment code.

8. All of the solicited advisory opinions concluded that all applicable regulations and procedures had been followed in Neal's case, and that there had been no violation of any right of Neal's. Neal does not challenge the propriety of the Board's seeking or considering these advisory opinions.

9. Neal had informed the BCNR through his attorney that he did not wish to appear before the Board, and he does not now contend that he should have been granted a hearing before that Board.

the cognizance of the Commandant. The majority of the Board was of the view that in Neal's case the Commandant's approval of the EPB recommendation was proper "on the basis of the finding that [Neal's] overall service record cast doubt on [his] eligibility for continued service, based on the implied risk of continued involvement with military and civilian authorities and associated discredit to the Marine Corps." The majority further found that Neal had no right to appear before the EPB, no right to cross-examine witnesses against him, no right to counsel to assist him in preparing for the EPB, and that he suffered no substantial prejudice as a result of not being shown the 2 (sic) NIS reports considered by the EPB in its December (sic) 16, 1974 proceedings.[10] The majority also found that Neal was aware of the general nature of the NIS investigations, and that the EPB had considered his written statement on the matters covered by those investigations.[11]

The dissenting Board member found a procedural error warranting corrective action, in that the NIS reports contributed to the Board's recommendation, thus making it improper for the Board to have considered these reports without first giving Neal the opportunity to examine and make

comment on them. Accordingly, he recommended partial relief, to the extent that another EPB be convened to determine whether or not Neal should be reenlisted, and that Neal be given the opportunity to appear before the Board with counsel.

Having received an unfavorable decision from the BCNR, Neal once again sought the aid of this court, this time in an amended complaint in which he attacked the procedures used to deny him permission to reenlist as violative of prescribed regulations and of his constitutional rights.[12] It is the issues raised in that complaint which form the basis for motions that are now before us, and it is those issues to which we turn for discussion.

### III. *Jurisdiction*

The first disputed issue before us is whether we have subject matter jurisdiction over Neal's claims. In his amended complaint, Neal sets forth numerous statutory provisions which he claims confer subject matter jurisdiction on this court, only two of which merit serious consideration: the federal question statute, 28 U.S.C. § 1331 (1976), and the mandamus statute, 28 U.S.C. § 1361 (1976).[13] Because we be-

---

**10.** The EPB met on *October* 16, 1974, and it is clear that it considered *at least three* NIS reports on Neal, not counting the alleged incidents of police contact with Neal which were referred in the Oceanside, California police report.

The basis of the finding of no prejudice was that the EPB considered the NIS reports "in the context of investigative status only . . . and recorded that status in terms such as 'interviewed,' 'allegedly' and 'charges never materialized.'" The BCNR cited the use of this language, along with the nonpunitive nature of Neal's fully honorable discharge, as support for its position that the EPB was not operating under the mistaken impression that Neal had been convicted of anything.

**11.** In fact, it appears that Neal's statement did not cover the first NIS-investigated incident, nor did it cover the two unspecific incidents when Neal allegedly had contact with the Oceanside, California police.

**12.** We invited Neal to amend his complaint in view of the changes in the factual record and the posture of the case in the time since the original complaint had been filed. We also

invited both sides to supplement the factual record at that time, and certain supplemental affidavits were filed by both sides in response.

**13.** We categorically reject all of the other jurisdictional bases suggested by Neal. It is now firmly established that the Declaratory Judgment Act, 28 U.S.C. § 2201, does not confer subject matter jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), nor does the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (1976). *See Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Federal Rules of Civil Procedure cannot form a basis for our exercise of jurisdiction given the unequivocal language of Fed.R. Civ.P. 82 that the rules "shall not be construed to extend or limit the jurisdiction of the United States district courts . . .." Finally, it is hornbook law that there must be a specific statutory grant of subject matter jurisdiction for a federal court to have the power to decide a case before it, *see U. S. ex rel. Gittlemacker v. County of Philadelphia,* 413 F.2d 84, 88 (3d Cir. 1969), *cert. denied,* 396 U.S. 1046, 90 S.Ct. 696, 24 L.Ed.2d 691 (1970), so we must also

lieve that we have federal question jurisdiction pursuant to § 1331 we will focus our discussion on that jurisdictional font, without reaching any question of the scope of our mandamus jurisdiction.[14]

The Government contends that while Neal's amended complaint may well raise questions "[arising] under the Constitution, laws, or treaties of the United States," § 1331 alone will not support jurisdiction in this court because it does not contain the requisite waiver of sovereign immunity. Quoting from *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) the Government argues that although Neal's suit is nominally against federal officers, it is in fact against the United States because a judgment in Neal's favor would "interfere with the public administration," " 'restrain the Government from acting, or to compel it to act,' " and " 'expend itself on the public treasury or domain.' " Specifically, the Government notes that Neal seeks both an order compelling broad-ranging governmental action and a monetary judgment from the public treasury in the form of judicially authorized backpay. According to the Government, it is precisely this kind of suit which is barred by the doctrine of sovereign immunity, irrespective of the substantiality of any federal question raised by the complaint.

■ The legal principles which define the contours of the doctrine of sovereign immu-

nity are far from clear. The cases do support the Government's position that as a general rule, a suit against a public official in his official capacity is treated as if it were brought directly against the government, *see Hawaii v. Gordon*, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1973),[15] and that immunity bars a suit which will interfere with the public administration or affect the public treasury. See *Dugan v. Rank, supra.* There are, however, exceptions to this general rule. Sovereign immunity is not a bar if the public official is acting in excess of his authority, or if his authority is unconstitutional or is being exercised in an unconstitutional manner. See *Dugan v. Rank, supra* 372 U.S. at 621–22, 83 S.Ct. 999; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

It is clear from the allegations of Neal's amended complaint that he is attempting to overcome the sovereign immunity bar by fitting within the above-described exceptions to the general rule. The complaint is replete with allegations that the defendants acted beyond their authority (*e. g.* by failing to follow their own regulations and by rendering a decision for which there was no basis in fact) and that they violated Neal's constitutional rights (*e. g.* by failing to accord him procedural due process before the EPB). It is also evident, though, that a determination of the sovereign immunity

---

reject any contention that the Fifth Amendment or the "equity jurisdiction of the District Courts" confers subject matter jurisdiction.

14. The federal question statute, as amended in 1976, now provides in pertinent part:

§ 1331. *Federal question; amount in controversy; costs*

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States *except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.*

The 1976 amendment, which added the portion underlined above, was enacted along with the amendment of § 702 of the APA to be discussed *infra*, for the stated purpose of "[re-

moving] . . . technical barriers to the consideration on the merits of citizens' complaints against the Federal Government, its agencies or employees." H.R.Rep.No.94–1656, 94th Cong., 2d Sess. 3, *reprinted in* [1976] U.S. Code Cong. & Admin.News, pp. 6121, 6123.

15. *But see Jaffee v. United States*, 592 F.2d 712 (3d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) stating that *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) and their progeny, which hold that *federal officials* do not enjoy absolute immunity from damage suits, would not afford Jaffee "a traversable bridge across the moat of sovereign immunity" in his suit against the *Government itself*. 592 F.2d at 717 (emphasis added).

issue thus posed requires a decision on the ultimate questions in the suit. Other courts have resolved this seemingly circular problem of how to avoid deciding the merits of a case under the guise of a jurisdictional determination by adopting a procedure of accepting at face value, for jurisdictional purposes only, the averments of the complaint, unless they are so insubstantial or frivolous as to afford no conceivable basis for jurisdiction. *See, e. g., Carter v. Seamans*, 411 F.2d 767 (5th Cir. 1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *Cf. Mattern v. Weinberger*, 519 F.2d 150 (3d Cir. 1975), *vacated and remanded on other grounds sub nom. Mathews v. Mattern*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976) (where jurisdiction is alleged pursuant to the mandamus statute, the fact that the existence of a duty on the part of the defendant only becomes clear after consideration of the merits of the case does not deprive the court of mandamus jurisdiction; any other approach would lead to an "oddly circular result." *Id.* at 157).[16]

■ Employing this procedure in the instant case and accepting as true the averments of the complaint for jurisdictional purposes only, we must reject defendants' sovereign immunity claim. Neal alleges in his amended complaint that the defendants violated his Fifth Amendment due process rights by, *inter alia*, considering untrustworthy hearsay statements as evidence against him while denying him the right to even see those statements, denying him the right to consult with counsel to prepare a defense against then-unknown charges against him, denying him the right to representation before the EPB, and denying him the right to confront adverse witnesses. ¶ 14. Neal further alleges that the defendants failed to follow their own regulations by ignoring the prescribed guidelines and standards for barring reenlistment. ¶ 14.

These allegations are neither insubstantial nor frivolous; rather, they raise serious questions as to whether the defendants have acted in excess of their authority or whether their authority is unconstitutional or was exercised in an unconstitutional manner in Neal's case. Accordingly, Neal's allegations are sufficient to overcome defendants' sovereign immunity defense.

Even if we were to determine that the allegations of Neal's complaint are not sufficient to bring the case within the exception to the sovereign immunity doctrine, we would nevertheless reject defendants' sovereign immunity claim because we believe that Congress has waived immunity to some of Neal's claims by statute. We find precedent for this proposition in the recent Third Circuit decision of *Jaffee v. United States*, 592 F.2d 712 (3d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). There the court held that the 1976 Amendments to § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (1976), reflect a Congressional intent to waive sovereign immunity under some circumstances. This section now provides, in pertinent part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party . . . Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any

---

**16.** *See also* C. Wright, Law of Federal Courts § 7 at 19 (3d ed. 1976): "The jurisdiction of the federal courts is dependent on the subject matter of the action or the status of the parties to it; it is not dependent on the merits of the case." *But cf. Davis Associates, Inc. v. Secretary, Dept. of Housing and Urban Develop-* *ment*, 498 F.2d 385, 388 (1st Cir. 1974) (The district court erred in finding subject matter jurisdiction under § 1361 because its subsequent analysis of the statutory materials at issue conclusively demonstrated that defendants owed no "duty" to plaintiff).

action or deny relief on any other appropriate legal or equitable ground . ..

In *Jaffee*, rejecting the Second Circuit's contrary view as expressed in *Watson v. Blumenthal*, 586 F.2d 925 (2d Cir. 1978), the court held that "section 702, when it applies, waives sovereign immunity in 'nonstatutory' review of agency action under [28 U.S.C.] section 1331." 592 F.2d at 718.[17] Specifically, the court held that the waiver applies to *equitable actions* under § 1331, *i. e.* suits for relief other than money damages, in which review of *agency action* is sought, *i. e.* action by an "agency" as that term is defined in 5 U.S.C. § 701(b)(1) (1976). Our determination that this holding supports a finding in the instant case of at least a partial waiver of sovereign immunity can best be understood by first examining more closely the *Jaffee* case itself.

Stanley Jaffee was serving in the Army in 1953 when the Government tested a nuclear device at Camp Desert Rock, Nevada. Jaffee averred that he and other soldiers were ordered to stand in an open field near the explosion site without benefit of any protection against radiation, and that the Government knew but deliberately ignored the grave risks involved, and compelled the soldiers' participation in the testing and consequent radiation exposure. Jaffee further alleged that because of the radiation exposure, he had developed inoperable cancer.

Asserting that the Government had deliberately violated a number of rights guaranteed by the Constitution, Jaffee and his wife filed a four-count complaint in the United States District Court for the District of New Jersey. In Counts I, II and III, not important for purposes of this discussion, the Jaffees made various claims for money damages. Count IV was a class action in which Jaffee sought to represent all of the soldiers who were ordered to be present at the explosion. In this Count, naming only the United States as a defendant, Jaffee requested that the United States be required both to warn all class members about the medical risks facing them and to provide or subsidize medical care for the class. The district court dismissed Count IV on grounds of sovereign immunity, and while retaining jurisdiction over the other counts, it certified the dismissal for appeal. Thus it was the correctness of the district court's dismissal, on sovereign immunity grounds of Jaffee's Count IV request for both equitable and monetary relief, that was at issue before the Third Circuit in *Jaffee*.

After determining that the 1976 amendment to § 702 of the APA, 5 U.S.C. § 702 (1976), was a waiver of sovereign immunity in suits for equitable relief seeking "nonstatutory" review of agency action, the *Jaffee* court turned to the question whether *Jaffee's* Count IV claims came within the ambit of this waiver. The court first examined these claims in terms of the kinds of relief Jaffee sought on behalf of the class: government-subsidized medical care and warning about medical risks. Turning first to the request for medical care for the class, the court characterized it as an action for money damages, which was barred by sovereign immunity because it did not come within the waiver of § 702.[18] The claim for warning, however, was deemed equitable

---

17. As the court explained in *Jaffee*, suits seeking review of agency action are called "nonstatutory" if they are not brought under the statutes that specially provide for such review. "In these instances, judicial review is available, if at all, through actions involving matters which arise 'under the Constitution, Laws, or treaties of the United States' as provided in section 1331(a) of title 28." *Jaffee v. United States, supra*, at 718 n.12, *quoting* H.R.Rep.No. 94-1656, 94th Cong., 2d Sess. 5, *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 6121, 6125.

18. The *Jaffee* court canvassed various other statutory waivers of immunity, *e. g.*, the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 1346, 2671–2680 (1976) and the Military Personnel and Civilian Employees' Claims Act, 10 U.S.C. §§ 2733, 2735, 2736 (1976) to determine whether any would apply to these claims for money damages, but concluded that none would permit the kind of recovery sought by Jaffee, *i. e.*, compensation for personal injury or death of a member of the armed services if the injury or death is incident to his service.

and not foreclosed by the limitation of § 702 to non-monetary relief.[19]

Having determined that the Count IV claim for warning came within the waiver of § 702, and that it could properly be considered apart from the Count IV medical care claim which was barred, the court next turned to the question whether the governmental acts giving rise to Jaffee's suit were "agency action" so as to be covered by the statutory waiver. To make this determination, the court looked to the APA definition of "agency" as found in 5 U.S.C. § 701(b)(1) (1976). This section provides that "agency" includes "each authority of the Government whether or not it is within or subject to review by another agency . . . ." Following this broad definition, the statute creates several specific exceptions, none of which was found to be applicable to the United States Army under the facts of Jaffee. Accordingly, the district court's dismissal of Jaffee's claim seeking warning was reversed, and the case was remanded for judicial review of the challenged agency action pursuant to § 1331, the federal question statute.

We have discussed Jaffee at some length because we believe that it is sufficiently similar to the case at bar to control the sovereign immunity and jurisdictional issues. Here, as in Jaffee, a request for equitable relief is combined with one for money damages. The defendants in this suit, like those in Jaffee, have asserted the bar of sovereign immunity to all of the plaintiff's claims. It remains for us to apply the Jaffee court's analysis to the facts of this case to determine if sovereign immunity has been waived with respect to any of Neal's claims.[20]

Our first task is to examine Neal's claims with respect to the kinds of relief requested. Neal requests both monetary relief in the form of backpay and equitable relief in the form of an order to correct his military records by altering the reenlistment code and to allow him to reenlist as of the end of his prior enlistment term. Alternatively, although not specifically requested in the prayer for relief, Neal's counsel has suggested that at a minimum we should order the convening of a new EPB, which should be required to accord Neal rudimentary procedural due process before making the decision whether to permit him to reenlist. We first address the backpay claim.

19. The court rejected any suggestion that since a part of Count IV was equitable, the whole Count was an action seeking at least some "relief other than money damages," as that reading would conflict with the Congressional intent revealed by the House Report on the amendment of § 702: "The partial elimination of sovereign immunity will facilitate nonstatutory judicial review . . . without exposing the Government to new liability for money damages . . . ." H.R.Rep.No.94–1656, 94th Cong. 2d Sess. 19–20, reprinted in [1976] U.S.Code Cong. & Admin.News pp. 6121, 6140.

20. A threshold question not addressed in Jaffee but which arguably merits our attention is whether the provisions of the APA authorizing judicial review of agency action, contained in Chapter 7 of the Act, apply to the instant case. To answer that question, we refer to § 701(a), which provides:

This chapter applies, according to the provisions thereof, except to the extent that—
(1) statutes preclude judicial review; or
(2) agency action is committed to agency discretion by law.

The Government does not contend that any statute precludes judicial review here directly, but there is some suggestion that decisions following the principles set forth in Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953) make the actions at issue in the instant case unreviewable because they are entirely discretionary. To the extent that the Government's contention is based upon a general rule of judicial non-interference with the military, we recognize this salutary principle and discuss it in greater detail infra. However, as the Government itself notes, this rule is not an absolute bar to review. To the extent that the Government contends that this judicially-fashioned rule "[commits] agency action to agency discretion by law," we disagree. In view of the plethora of cases in which courts have reviewed agency actions like those at issue in the instant case, see, e. g., Widner v. United States, 556 F.2d 526 (Ct.Cl.1977); Flute v. United States, 535 F.2d 624, 210 Ct.Cl. 34 (1976); Richardson v. United States, 209 Ct.Cl. 754 (1976), and in view of the strong presumption in favor of reviewability, see Fekete v. U. S. Steel Corp., 424 F.2d 331, 334–35 (3d Cir. 1970), we must reject as well the Government's contention that review is precluded by § 701(a)(2).

■ Clearly Neal's request for backpay does not come within the statutory waiver of § 702. However, before we determine that sovereign immunity bars this claim we must follow the *Jaffee* court's lead and canvass other statutory waivers of immunity to determine if any of them might apply.

■ The only possibly relevant waiver of immunity we can find is the Tucker Act, 28 U.S.C. § 1346(a)(2) (1976), which provides:

The district courts shall have original jurisdiction, concurrent with the Court of Claims of:

. . . . .

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Together with 28 U.S.C. § 1491 (1976), the jurisdictional statute for the Court of Claims, this provision establishes a scheme by which the Court of Claims has jurisdiction over all contract actions against the United States, and shares this jurisdiction with the district courts only in actions in which the amount in controversy does not exceed $10,000; the Court of Claims has exclusive jurisdiction in actions for more than this amount. Although Neal nowhere specifies the precise amount of money at issue, he does aver in his amended complaint that his damages in lost pay and allowances are in excess of $10,000. ¶ 20. As a result, the Tucker Act limitation on district court power to award monetary relief in contract actions for more than $10,-000 precludes us from exercising jurisdiction over Neal's monetary claims.[21]

■ We turn now to Neal's claims for equitable relief, specifically, his claim for an order either to alter his reenlistment code to enable him to reenlist, or alternatively to require a new EPB to consider his case. Like the claim for warning in *Jaffee*, Neal's equitable claim is not foreclosed by the limitation of § 702 to non-monetary relief simply because he has unsuccessfully attempted to merge it with a claim for money damages from which the Government can properly claim immunity from suit.[22] Accordingly, we will exercise jurisdiction over Neal's equitable claim provided that upon completion of our analysis, which tracks *Jaffee*, we are persuaded that this claim otherwise comes within the statutory waiver of § 702.[23]

21. The fact that we are precluded from exercising jurisdiction over Neal's backpay claim does not leave him without a monetary remedy. As is clear from our discussion of the Tucker Act, jurisdiction over this kind of claim lies exclusively with the Court of Claims. Subject to the general principles of res judicata and collateral estoppel, nothing would preclude a litigant from seeking monetary relief in the Court of Claims following a suit for equitable relief in a district court on the same claim. *See, e.g., Greene v. United States*, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), where a separate action to recover backpay was instituted in the Court of Claims after the Supreme Court held in *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), that the plaintiff's dismissal was illegal. *See also Crawford v. Cushman*, 531 F.2d 1114, 1126 n.17 (2d Cir. 1976).

22. We do not share the concern expressed in *Carter v. Seamans*, 411 F.2d 767, 775 (5th Cir. 1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970) that because collateral estoppel is available, if the district court were to declare plaintiff's discharge illegal it would be "deciding indirectly" a monetary claim for more than $10,000, over which the Court of Claims had exclusive jurisdiction. A decision on Neal's claim for equitable relief may or may not determine whether he is entitled to any monetary relief, and clearly will not determine the amount of such relief, if indeed he is entitled.

23. The oft-cited case of *Carter v. Seamans, supra*, in which the district court refused to exercise jurisdiction over the plaintiff's challenge against his discharge from the Air Force, and the Fifth Circuit affirmed, is easily distinguishable from the instant one. *Carter* began in the district court as an action for a judgment declaring plaintiff's Air Force discharge a nullity, for backpay and other benefits, and for correction of military records. Prior to commencing this district court action, the plaintiff had initiated an identical suit in the Court of Claims. The latter court had stayed all proceedings before it pending the outcome of the case in the district court. These somewhat

Under the analytical model established in *Jaffee*, there is one remaining step before we can decide to exercise jurisdiction over Neal's equitable claim, *viz.*, to determine whether the governmental acts giving rise to Neal's suit are "agency action" so as to be covered by the statutory waiver of § 702. To make this determination we look to the APA definition of "agency" as found in 5 U.S.C. § 701(b)(1) (1976).

▉ According to the definition set forth in § 701(b)(1), "agency" includes "each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . ." Following this broad definition there are several specific exceptions, two of which apply to the military, but neither of which applies to the instant case.[24] Neal asks us to review actions taken by both the EPB

and the BCNR and to grant appropriate relief, and we conclude that the actions of these two boards are "agency actions" covered by the statutory waiver of immunity of § 702. Accordingly, we have jurisdiction to review these actions pursuant to 28 U.S.C. § 1331, the federal question statute, and must address the merits of the case.

## IV. *Scope of Review*

Courts have traditionally been most reluctant to intervene in military affairs, especially in areas of administrative decision-making, in which some measure of discretion is involved. *See generally Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Keister v. Resor*, 462 F.2d 471, 474 (3d Cir.), *cert. denied*, 409 U.S. 894, 93 S.Ct. 116, 34 L.Ed.2d 151 (1972). This

---

unique circumstances, according to the district court, raised the following issues: (1) whether the doctrine of sovereign immunity was a bar to the entire suit; (2) whether there was subject matter jurisdiction pursuant to 28 U.S.C. § 1361, the mandamus statute; and (3) whether, assuming there was mandamus jurisdiction, the court should exercise it and decide the plaintiff's claim.

In an unpublished opinion adopted and incorporated verbatim by the Fifth Circuit, the court resolved these issues as follows: (1) sovereign immunity would not be a bar to any part of the action; (2) mandamus jurisdiction under § 1361 would lie; and (3) the court would, exercising its discretion, decline to exercise its mandamus jurisdiction and would dismiss the case without prejudice, because the plaintiff had an adequate remedy in his previously initiated Court of Claims action.

The *Carter* case is inapposite for several reasons. First, our present discussion has focused on federal question jurisdiction, rather than on the mandamus jurisdiction which was at issue in *Carter* (although Neal also argues in favor of mandamus jurisdiction). Consequently, our jurisdictional inquiry, unlike that of the *Carter* court, has not been colored by those considerations peculiar to the mandamus remedy, *i. e.*, that "mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases," and that although "it is a legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion." *Id.* at 773. Second, it should be emphasized that *Carter* is not principally a jurisdictional decision; rather, it is a decision which recognizes that the mandamus jurisdictional test is different from the test for whether, under a given set of circum-

stances, it is appropriate to grant the mandamus remedy, *i. e.*, the *Carter* court found that it had mandamus jurisdiction but, as a matter of discretion, declined to exercise it. *Id.* at 775. Finally, even if our exercise of federal question jurisdiction in the instant case were to be influenced by the same kinds of discretionary factors addressed by the *Carter* court, the balance would unquestionably tilt the other way, *i. e.*, in favor of our exercising jurisdiction. Unlike *Carter*, Neal has no identical suit pending in the Court of Claims. In fact, in light of the circumstances at the time Neal instituted this suit (*i. e.*, Neal had to exhaust his administrative remedies before seeking judicial relief from his allegedly illegal discharge, but the BCNR declined to hear his case), there was but one remedy available to him and but one forum in which to seek it: mandamus relief in a federal district court. When the BCNR finally agreed to hear Neal's case we entered an order to this effect, and retained jurisdiction over the matter. At this stage of the proceedings, some 22 months later, if indeed we have jurisdiction as in fact we do, we can think of no reason not to act in accordance with that order and decide this case.

**24.** Section 701(b)(1)(F) excludes "courts martial and military commissions," both of which are tribunals for trying certain classes of criminal or wartime offenses, *see Madsen v. Kinsella*, 343 U.S. 341, 345–47 nn.8–10, 72 S.Ct. 699, 96 L.Ed. 988 (1952), and so has no bearing on this case. Section 701(b)(1)(G), discussed at some length in *Jaffee*, excludes "military authority exercised in the field in time of war or in occupied territory," hence also is clearly inapplicable.

reluctance is traceable both to the now-discarded doctrine forbidding review of all actions by the Executive, and to the still-current view that the need for strict discipline and expeditious action in the military makes it undesirable for courts to provide a forum for protracted debate over military actions. *See generally Cortright v. Resor*, 325 F.Supp. 797, 814–15 (S.D.N.Y.), *rev'd. on other grounds*, 447 F.2d 245 (2d Cir. 1971), *cert. denied*, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).

Consistent with these principles, defendants reason that because the challenged action in the instant case is a discretionary administrative decision by the Commandant not to reenlist Neal, we must limit our review to an inquiry whether the decision was within the Commandant's valid jurisdiction, and if we so find, we may proceed no further. We disagree.

■ Developments since *Orloff v. Willoughby, supra*, the high-water mark of judicial non-intervention in military matters, demonstrate that while civilian courts are not insensitive to the unique problems of the military, there is no broad barrier to judicial review of military affairs. Although the decisions are not uniform, there is a trend toward at least limited exercise of power to control abuses by military officials. Thus, traditional judicial trepidation over interfering with the military establishment has not prevented review to determine if a military official has acted outside the scope of his powers or in violation of regulations, *see Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); to determine the constitutionality of military statutes, executive orders and regulations, *see O'Mara v. Zebrowski*, 447 F.2d 1085 (3d Cir. 1971); *Melvin v. Laird*, 365 F.Supp. 511 (E.D.N.Y.1973), and cases cited therein at 515; or to determine if an action was arbitrary, capricious or an unlawful exercise of discretion, *see Matlovich v. Secretary of the Air Force*, 192 U.S.App.D.C. 243, 591 F.2d 852 (1978). We read these decisions as giving us both the power and the duty to inquire whether the decision not to reenlist Neal and the procedure by which

that decision was made were proper under the Constitution, statutes and regulations, bearing in mind that there is a strong presumption that the personnel involved in the decision-making process have faithfully discharged their duties, *see Richardson v. United States*, 209 Ct.Cl. 754, 755 (1976), and that we may not simply substitute our own judgment for that of the military in such matters of discretion. *See Storey v. United States*, 531 F.2d 985, 987, 209 Ct.Cl. 174 (1976); *National Broadcasting Co. v. F.C.C.*, 170 U.S.App.D.C. 173, 194, 516 F.2d 1101, 1122 (1974), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).

## V. *The Merits*

### A. *Introduction*

■ Neal contends that there were a number of defects in the various proceedings that culminated in the refusal to permit him to reenlist, some of which, he contends, are of constitutional magnitude. Mindful of the doctrine of constitutional adjudication that courts "ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable," *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944), we first examine the statutory scheme pertaining to reenlistment, in order to ascertain whether defendants' actions comported with all mandated regulations and procedures. We undertake this review mindful of the cases holding that the procedures, regulations and guidelines adopted by an agency are binding upon it. *See Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), so that while there may have been no obligation to adopt them in the first place, having done so an agency may not proceed without regard to them. *Id.* at 388, 77 S.Ct. 1152. This line of cases will not be helpful to Neal, however, because as will appear, the agencies that acted in Neal's case followed all prescribed statutes, regulations and procedures.

We will next consider Neal's contention that even if the defendants complied with all applicable statutes and regulations, the

refusal to permit him to reenlist was so arbitrary and capricious as to constitute an abuse of discretion. Once again, there is authority to support Neal's general proposition that courts will grant relief from arbitrary, capricious or irrational agency action, *see, e. g., Matlovich v. Secretary of the Air Force*, 192 U.S.App.D.C. 243, 591 F.2d 852 (1978); *Weiss v. United States*, 408 F.2d 416, 187 Ct.Cl. 1 (1969), but, as will be seen, we are simply unable to conclude that the agency action in Neal's case was so arbitrary or capricious to warrant judicial relief.

Because we find that defendants' actions were neither arbitrary and capricious nor statutorily improper, we must reach Neal's constitutional claims.[25] These, too, we are constrained to reject, on the basis of our conclusion, detailed below, that defendants' refusal to permit Neal to reenlist implicates no property or liberty interest of Neal's, and hence is not subject to the requirements of the due process clause.

**25.** Arguably, all of Neal's claims have some constitutional source, as there are numerous cases holding that the requirement that agencies comply with their own voluntarily-adopted regulations is itself a constitutional requirement mandated by the due process clause, *see generally United States v. Caceres*, —— U.S. ——, 99 S.Ct. 1465, 59 L.Ed.2d 733 n.1 and accompanying text (1979) (Marshall, J., dissenting), and that the proscription against arbitrary and capricious agency action is also constitutionally compelled. *See, e. g., Chung v. Park*, 514 F.2d 382, 387 (3d Cir.), *cert. denied*, 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975).

**26.** The Commandant, with power delegated to him by the Secretary of the Navy, exercises plenary control over reenlistments pursuant to 10 U.S.C. § 508(b) (1976), which provides:

(b) A person discharged from a Regular component may be reenlisted in the . . . Regular Marine Corps . . . under such regulations as the Secretary concerned may prescribe.

In *Richardson v. United States*, 209 Ct.Cl. 754 (1976) the court said that because of the clearly permissive language of this provision, no service member has any statutory right to reenlist, rather, "Congress intended for the Service Secretaries to exercise total control on the conditions and circumstances under which a

### B. Plaintiff's Statutory and Regulatory Claims

#### 1. The EPB Proceedings

The EPB is a standing board convened from time to time pursuant to a precept of the Commandant to consider, *inter alia*, all requests for reenlistment and extension of enlistment which are referred to Marine Corps Headquarters for final decision. *See* Exhibit 1 to Defendants' Motion to Dismiss or for Summary Judgment (affidavit of Col. William E. Riley, Jr.). The purpose of the EPB is to make a recommendation to the Commandant pertaining to the personnel matter it was convened to consider. *Id.*[26]

In Neal's case, the EPB was convened in connection with Neal's request for a five year reenlistment which, if granted, would have extended his total term of Marine Corps service beyond 20 years.[27] *Id.*[28] To aid the Board in conducting this kind of review, the "Procedure and Guidance" section attached to the Precept for the EPB instructs the Board, in pertinent part:

military member may be permitted to reenlist." *Id.* at 758.

**27.** Twenty years of service is significant because a person serving for that period of time is eligible for full federal retirement benefits.

**28.** It is important to note that Neal assumes that the EPB considered his case and recommended against reenlistment pursuant to its mandate to conduct "substandard review" of those Marines who are alleged to have engaged in some form of "substandard performance." *See* Amended Complaint ¶ 7. He outlines the "Criteria for Substandard Performance" to be used by the Board for this kind of review, and lists the various recommendations the Board is empowered to make when it finds "substandard performance," implying that the EPB proceedings were defective because the Board failed to use the listed criteria to make one of the authorized recommendations. Many of Neal's contentions in this suit are bottomed on the charge that he has now been "branded as guilty of substandard performance." *See* Amended Complaint ¶ 24. Neal points to no evidence to support these allegations, and in light of defendants' affidavits and the EPB report itself, all stating that the Board considered Neal's case in connection with *his reenlistment request*, Neal's unsupported allegations are insufficient to raise any genuine factual issue as to the reason for EPB review.

## SERVICE BEYOND TWENTY AND THIRTY YEARS

1. The Board will, in accordance with reference (d) and other supplementary directives, process all requests for reenlistment/extension of enlistment which are referred to this Headquarters for final decision.

2. The Board in making its recommendation will be guided by the applicable provisions of paragraphs 1133 and 5390 of reference (d).

According to the Precept for the EPB, reference (d) is the Marine Corps Manual (MARCORMAN). Section 1133, entitled "Reenlistments and Extensions of Enlistments," defines those terms, sets forth information about a Career Planning Program designed to encourage highly qualified Marines to stay in the service, and contains a statement on standards of eligibility for enlistment and reenlistment.[29] Section 5390, entitled "Military Leadership," describes certain leadership qualities which the Corps seeks to promote, allocates responsibility for establishing and maintaining high standards of leadership among the Commandant, the Commanders (including both commissioned and noncommissioned officers), and individual Marines, and sets forth standards for good personal relations between officers and young Marines. The subparagraphs on personal relations between officers and their charges are expressly made applicable to noncommissioned officers.

We have examined the EPB report and recommendation on Neal's reenlistment request in light of the directions set forth in the Precept, and we conclude that the Board observed the standards and policies applicable to the kind of review it was directed to perform in Neal's case. Both the introduction to the EPB report on Neal's case that "Neal was referred to [the] Board in connection with his request for a 5 year reenlistment" and the Board's conclusion that "Neal's personal conduct over the last five years [was] not in keeping with the high standards expected of Marine SNCO's" reflect an awareness of the nature of the review the Board was charged with conducting, and there is nothing in the record to suggest that it did not follow the applicable standards and policies.

In addition to furnishing standards and policies to guide the EPB's review of cases referred to it, the Precept also sets forth procedures for EPB review. These, two were followed in Neal's case. The Board considered Neal's entire service record,[30] and submitted a report and recommendation as required by the Precept. There is nothing in the record to indicate that the Board's proceedings were improper in any respect, and absent such evidence we must presume compliance with prescribed procedures. See *Richardson v. United States,* 209 Ct.Cl. 754, 755 (1976). Finally, there is no provision for a hearing or representation by counsel before the EPB, nor is there any requirement that the Board make findings of fact, yet these are Neal's two principle

---

**29.** The subsection on standards provides:
 3. Standards
 a. Lance corporals and below, to be eligible for reenlistment or extension of enlistment, must be potential noncommissioned officers.
 b. Noncommissioned officers, to be eligible for reenlistment or extension of enlistment, must have demonstrated the high standards of leadership, professional competence, and personal behavior required to maintain the dignity and authority of Marine Corps noncommissioner officers.
 c. Highly qualified noncommissioned officers are encouraged to serve a full 30-year career. Their maturity, experience, and professional ability constitute a strong link in the chain of command and a vital segment of

the organizational structure of the Marine Corps.
 d. The approval of the Commandant of the Marine Corps is required prior to effecting a reenlistment or extension which would provide for service beyond a total of 20 years active service.

**30.** The EPB report states that Neal was a "slow beginner," but that his more recent performance had been "generally described as excellent," and the Board concluded that Neal's "overall service record reveals an above average to excellent Marine." These statements are evidence that the Board's review of Neal's record was expansive, and not merely limited to the NIS investigative reports.

claims of EPB irregularities. Accordingly, we conclude that the EPB proceedings in Neal's case were procedurally proper.

### 2. BCNR Review

Pursuant to 10 U.S.C. § 1552(a) (1976), the Secretary of the Navy has established the Board for the Correction of Naval Records.[31] The regulations governing BCNR procedures are found at 32 C.F.R. § 723 *et seq.* (1978). The BCNR is a civilian board charged with the review and consideration of "all applications properly before it for the purpose of determining the existence of an error or injustice." 32 C.F.R. § 723.2(b).

Neal's challenge to the BCNR proceedings begins with the premise that the statute creating the Board is remedial legislation, which imposes upon the Secretary the duty to properly evaluate all "errors" and "injustices" under a liberal, rather than a narrow or technical, standard. Proceeding from this premise, Neal argues that in order to discharge this statutorily-imposed duty, the Secretary has vested the BCNR with extensive powers. Finally, Neal contends that by improperly allocating the burden of proof of "error in injustice" to him, and by refusing to conduct a *de novo* inquiry into Neal's service record, the Board failed to fully exercise and discharge the duties and powers delegated to it by the Secretary.

Although we accept Neal's premise as to the remedial purpose of the statute enabling the establishment of the BCNR, we do not find any impropriety in the Board proceedings in Neal's case. In considering an application for relief, the Board is instructed to review the application and the available military or naval records pertinent to the corrective action requested, 32 C.F.R.

§ 723.3(e)(1), and it followed this procedure in Neal's case. The regulations authorize the Board to hold a hearing for further development of the issues raised, or to recommend in favor of or against corrective action without a hearing. *Id.* at § 723.-3(e)(1). Neal did not request a hearing, so on the basis of the documentary evidence alone, the Board acted on his application for correction. Neal received a written statement from the Board which addressed each of his claims and which informed him of the basis for its 2–1 decision to deny his application for relief. Like the other Board proceedings we have already reviewed this, too, conformed to the applicable regulations. *See* 32 C.F.R. § 723.3(e)(5)–(6).

Finally, we find no support for Neal's contention that the BCNR was required to impose upon the Marine Corps the burden of showing the propriety of the decision not to permit him to reenlist or to undertake its own *de novo* evaluation of Neal's service record. The regulatory scheme places upon the applicant the burden of demonstrating the existence of probable error or injustice, *see* 32 C.F.R. § 723.-3(e)(2), and both the language of 10 U.S.C. § 1552(a) and the cases interpreting the statute make it abundantly clear that the scope of a correction board's authority is a matter which is discretionary with the particular service secretary. *See, e.g., Biddle v. United States*, 186 Ct.Cl. 87, 94 (1968). Consequently, a regulatory scheme which places the burden on the applicant is within the discretion of the Secretary and is entirely proper. With respect to the scope of BCNR review, it is established that proceedings before the Board are not *de novo* determinations, rather, they are a review of

---

**31.** 10 U.S.C. § 1552(a) provides:

1552. *Correction of military records: claims incident thereto* (a) The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice. Under procedures prescribed by him,

the Secretary of the Treasury may in the same manner correct any military record of the Coast Guard. Except when procured by fraud, a correction under this section is final and conclusive on all officers of the United States.

The statute was intended to relieve Congress from the consideration of private bills to correct injustices. *See Ogden v. Zuckert*, 111 U.S. App.D.C. 398, 400, 298 F.2d 312, 314 (1961).

prior action. *See Van Bourg v. Nitze*, 128 U.S.App.D.C. 301, 310, 388 F.2d 557, 566 (1967). We conclude that the BCNR proceedings, like those conducted by the EPB, were in compliance with all applicable statutes and regulations.

### C. *Neal's Abuse-of-Agency-Discretion Charge*

The last non-constitutional contention we address is Neal's claim that the defendants' actions with respect to him constituted an abuse of discretion in that they were arbitrary, capricious and unsupported by substantial evidence. For us to reverse on these grounds we must have clear and convincing evidence of arbitrary and capricious action, *Unterberg v. United States*, 412 F.2d 1341, 1345–46, 188 Ct.Cl. 994, (1969); we may not reverse an agency decision simply because we disagree with it. *Storey v. United States*, 531 F.2d 985, 987, 209 Ct.Cl. 174, (1976).

We first consider the contention that the agency decisions with respect to Neal were unsupported by substantial evidence. Neal's discussion of this issue proceeds from what we have already noted is an unsupported and erroneous assumption that the defendants found him guilty of "substandard conduct," *see* note 27, *supra*, and his argument loses its force in light of the fact that defendants never did so conclude. What defendants did conclude is that Neal's conduct had not been "in keeping with the high standards expected of a senior noncommissioned officer," in that his past involvements with both civilian and military police created an "implied risk of continued involvement . . . and associated discredit to the Marine Corps." We cannot say that this conclusion was unsupported by the record before the two Boards.[32]

Neal also contends that the defendants culled his record for the few unfavorable reports therein, while ignoring the majority of his impressive service career. It is well-established that the Boards must be expected to examine all pertinent records, and that to ignore relevant and important aspects of someone's service career would be improper. *See generally Biddle v. United States*, 186 Ct.Cl. 87, 104 (1968). It is also well-established, however, that in the absence of evidence to the contrary we must assume that the Boards performed their official duties properly. *Id.* at 104. Not only does Neal present no evidence to the contrary, but in fact the written EPB report itself belies Neal's contention that only the unfavorable aspects of his record were considered by the Board.[33] Furthermore, the mere fact that there are numerous complimentary reports in Neal's record, standing alone, does not render the decision to deny reenlistment arbitrary or capricious. *See Knehans v. Callaway*, 403 F.Supp. 290, 295 (D.D.C.1975), *aff'd sub nom. Knehans v. Alexander*, 184 U.S.App.D.C. 420, 566 F.2d 312 (1977), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 83 (1978). Under these circumstances, we can only conclude that the defendants properly considered Neal's entire service record.

We next turn to Neal's contention that the defendants abused their discretion by failing to give sufficient indication of the grounds for their decision. The basic concept underlying this claim is that a reviewing tribunal cannot appraise an agency determination under the appropriate standards of review unless the agency furnishes some helpful insight into its reasoning and the standards by which it was guided. See *Delaware River Port Authority v. Tiemann*, 531 F.2d 699 (3d Cir. 1976); *see generally Matlovich v. Secretary of the Air Force*, 192 U.S.App.D.C. 243, 591 F.2d 852 (1978) and cases cited therein at 248 of 192 U.S.App. D.C., at 857, of 591 F.2d. While this umbrella principle is fully applicable to the Marine Corps' decision not to reenlist Neal, it is our view that the defendants furnished sufficient explanation of the basis for their decision.

---

**32.** *See* our discussion of the contents of Neal's service record at Part II, pp. 767–768 and note 3, *supra*.

**33.** *See* note 30 and accompanying text, *supra*.

The EPB followed the standards set forth in paragraphs 1133 and 5390 of MARCORMAN. The basis for the Board's decision was that although Neal's service record was "above average to excellent," although he had successfully completed the SNCO leadership course and the Engineer's Equipment Chief's Course, and although a psychiatric evaluation found him fit for further duty, his contacts with military and civilian authorities in the previous 5 years had been "prejudicial to the Marine Corps and not in keeping with the high standards expected of Marine SNCO's." Similarly, the BCNR guided by standards set forth in 32 C.F.R. § 723 *et seq.*, furnished an adequate explanation of the basis for its refusal to correct Neal's record. Specifically, the Board majority found no substantial prejudice to Neal as a result of his not having been shown the NIS reports considered by the EPB, because the EPB understood that the reports were not indicative of guilt of the misconduct being investigated, because the recommendation that Neal be honorably discharged was not punitive, because Neal's written statement reflected his awareness of the general nature of two of the NIS investigations considered by the EPB, and because the Board did consider Neal's own written statement. We are not required to agree with the agency decisions we are asked to review, nor are we permitted to reverse those decisions because we might believe them to be unwise. *See Storey v. United States*, 531 F.2d 985, 987, 209 Ct.Cl. 174, (1976). The law only requires that agencies have some standards to govern their discretionary determinations, *see White v. Roughton*, 530 F.2d 750 (7th Cir. 1976), and that they explain their actions in the context of those standards. *See generally Matlovich v. Secretary of the Air Force, supra*. Defendants' actions with respect to Neal met these minimum requirements, hence we cannot say that the actions were arbitrary or capricious, or that they constituted an abuse of discretion.

### C. Plaintiff's Constitutional Claims

#### 1. Introduction

The due process clause of the Fifth Amendment mandates procedural safeguards against governmental deprivation of an individual's property and liberty interests. *Klein v. Califano*, 586 F.2d 250, 257 (3d Cir. 1978). The usual due process analysis is two-staged: determining whether a constitutionally protected property or liberty interest is implicated, and if so, then assessing the appropriate measure of procedural protection due. *Colm v. Vance*, 186 U.S.App.D.C. 132, 134–5, 567 F.2d 1125, 1127–28 (1977). If it is determined that the aggrieved party has no protected property or liberty interest, then the due process clause does not apply, and the party is left with only those procedural protections established by or otherwise binding upon the government agency or official whose action the aggrieved party seeks to challenge. *See, e.g., Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Neal contends that by refusing, without a hearing, to permit him to reenlist, the Corps denied him rights guaranteed by the due process clause. Specifically, he claims that he was denied any opportunity to appear before the EPB to examine adverse evidence or confront adverse witnesses, or to consult with an attorney in preparing a statement for submission to the EPB, and that the BCNR proceedings did not cure these constitutional deficiencies because the latter Board failed to fully exercise its equitable powers. There is no factual dispute as to the rights accorded Neal by the EPB. However, defendants dispute Neal's contentions that there were constitutional deficiencies in the proceedings before both Boards. To test Neal's contentions we must first determine if any property or liberty interest of his was implicated by the decision not to permit him to reenlist; we define the contours of the procedural protection due Neal only if we first determine that the due process clause applies. *Colm v. Vance, supra*, 186 U.S.App.D.C. at 135, 567 F.2d at 1128. In our view, because of the absence of a cognizable property or liberty interest, it does not apply.

#### 2. Neal's Property Interest Claim

Property interests protected by the due process clause are not limited to

ownership of real or personal property but extend to an individual's "legitimate claim of entitlement" to an acquired benefit. *Klein v. Califano, supra* at 257. The due process clause does not create protected property interests, rather, the Constitution protects property interests that are "created and . . . defined by existing rules or understandings that stem from an independent source . . .—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

Neal does not base his claim of entitlement upon any statute or regulation.[34] Rather, he bases it upon a "reasonable expectation" of a full career in Marine Corps, an expectation which he contends was fostered by Marine Corps officials through their recruitment campaign replete with promises of financial and job security in the Corps, through the way they addressed him as a "lifer," through their selecting him (because his record was "one of the Corps' finest") for a term of recruiting duty which would extend beyond his then-current enlistment term, and through their promoting him to gunnery sergeant with the concomitant requirement that he execute an agreement to extend his enlistment or reenlist for an additional 2 year period.

It is clear from Neal's allegations that he is attempting to bring his case within the ambit of the due process principles set forth in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and its progeny, by alleging a property interest in continued Marine Corps service which, "[while] not secured by a formal contractual . . . provision, was secured by a no less binding understanding fostered by the [defendants]." *See Perry v. Sindermann, supra* at 599–600, 92 S.Ct. at 2699. In other words, by alleging the existence of "understandings, promulgated and fostered by [Marine Corps] officials," Neal hopes to "justify his legitimate claim of entitlement to [reenlistment]." *See Perry v. Sindermann, supra* at 602, 92 S.Ct. at 2700.

Neal avers, in his Amended Complaint, that his "reasonable expectancy that he would remain in the Marine Corps [was] based on the Marine Corps requiring him to agree to remain in the Corps by reenlisting or extending his term of service in December of 1973 for a period of two years, [on] the periodic career counseling given to him by the Marine Corps, . . . [on] informal talks with his unit's executive officer, commanding officer or senior enlisted personnel . . . [and on being] treated . . . as a career Marine." ¶ 23. He contends that "it was expected that he would remain in the Marine Corps until retirement," *see* ¶ 23, and that his expectancy was reasonable because his commanding officer advised him to request reenlistment, and because he was sent to a joint services school at Fort Belvoir, Virginia, and "it would have made no sense to send [him] to the school if he was going to be discharged." ¶ 23.

Viewing as a whole all of Neal's allegations with respect to official Marine Corps encouragement that he follow a Marine Corps career (*e. g.* the career counseling, the informal talks, the advice to reenlist, the joint services school), we cannot infer anything approaching a "common law" of reenlistment, *see Perry v. Sindermann, supra* at 602, 92 S.Ct. 2694, which might support a legitimate claim of entitlement to continued service in the Marine Corps. The allegations with respect to the agreement that Neal was required to sign on the occasion of his promotion to gunnery sergeant, however, could conceivably support such an inference, and for that reason should be scrutinized more closely.

The agreement Neal was required to sign says:

> 731206: I have read and understand the provisions of MCO 1400.29 par 3010.2 dtd

---

**34.** Any claim to a statutory right or entitlement to reenlist is, as a practical matter, precluded by the provisions of 10 U.S.C. § 508(b) (1976), which vests in the Commandant broad discretion over the terms and conditions under which reenlistment may be permitted. *See* note 26, *supra.*

731102 and I agree to comply with its stated policy. I hereby agree to extend my enlistment, to reenlist, or to otherwise effect an extension of my active duty for a period of two years. I further agree not to initiate any action leading to my discharge, release from active duty, or transfer to the Fleet Marine Corps Reserve during this obligated period of service except as may be authorized by the Marine Corps.

MCO P1400.29A, paragraph 3010.2 refers to the Marine Corps Promotion Manual (MARCORPROMAN), and more specifically to the requirements for promotion to the rank of gunnery sergeant. These requirements provide, *inter alia*, that the person being promoted must agree to serve for a period of 2 years from the date of appointment. *See* subsection b(2)(c). Additionally, there is a reference to a "NOTE" which is found on the following page of the Manual, and which provides:

> "Prior to receiving an appointment to gunnery sergeant, or above, Marine serving in or with the Regular Establishment will sign the following statement on page 11 of their service records:
>
>> 'I have read and understand the provisions of MCO P1400.20A, par. 3010.2 and I agree to comply with its stated policy. I hereby agree to extend my enlistment, to reenlist or to otherwise effect an extension of my active duty for a period of 2 years *if necessary*. I further agree not to initiate any action leading to my discharge . . . during this obligated period except as may be authorized by the Commandant of the Marine Corps.' " (Emphasis added).

The words "if necessary," underlined above, are not found in the agreement actually signed by Neal on the occasion of his promotion. However, the above-quoted "NOTE" from MARCORPROMAN is incorporated by reference into the agreement actually signed by Neal. The issue, then, is whether Neal's agreement, required by the Marine Corps, to extend or reenlist for an additional 2 year period, imposed upon the Marine Corps any reciprocal obligation to permit him to serve for that 2 year period, *i. e.*, whether Neal had a "legitimate claim of entitlement" to continued Marine Corps service as a result of being required to sign this agreement. We hold that he did not have any such claim for several reasons.

First of all, Neal signed the agreement as a condition for promotion to the rank of gunnery sergeant.[35] On the theory that this agreement would be enforceable consistent with ordinary contract law principles, *cf. Crane v. Coleman*, 389 F.Supp. 22, 24 n.6 (E.D.Pa.1975) (enlistment is a contract between the United States and the enlistee and is governed by general principles of contract law), Neal might conceivably have had a cause of action against the Corps if, after having met all of the requirements for promotion to gunnery sergeant, including the signing of the agreement, he had been denied the promotion. But what Neal seeks to do here, by urging us to construe the agreement as creating an "entitlement" to continued service, is to impose upon the Marine Corps obligations which it simply never undertook. The agreement upon which Neal relies for his property entitlement claim gives the Marine Corps ultimate control over whether or not to enforce the obligations contained therein, so that any alleged reciprocity is illusory at best. Moreover, the agreement actually signed by Neal incorporates by reference the above-quoted MARCORPROMAN "NOTE" which, by use of the words "if necessary," makes even clearer the conditional nature of the obligation Neal was undertaking. Finally, Neal's own service record indicates that on several occasions he either extended his enlistment or reenlisted,

---

35. According to the defendants, the rationale for the requirement is to promote the Marine Corps' interest in efficiency and stability in the senior enlisted ranks by assuring that after preparing an enlisted person for promotion, the Corps can enjoy his services in that new position for a reasonable period of time, *i. e.*, in return for the promotion, there is an obligation not to seek discharge or release from active duty. *See* Affidavit of Col. Martin Egan, attached to Defendants' Supplementary Memorandum of Law.

and the documents executed on those occasions reflect the manner in which the Marine Corps can obligate itself to allow a period of additional service should he choose to do so.[36]

What we are faced with, then, is the plain language of the agreement and the MARCORPROMAN "NOTE" which it incorporates by reference (giving the Commandant authority to determine whether or not to enforce it), the context of the agreement (the MARCORPROMAN requirements for promotion to gunnery sergeant), the defendant's uncontradicted evidence that the active duty service obligation of an individual who agrees to extend or reenlist but is not required to do so will terminate on the normal expiration of his current enlistment[37] and Neal's statement that he believed that he would be permitted to reenlist. Taking all factual inferences against the defendants and in favor of Neal, the most that we can conclude is that Neal had the "subjective expectancy" that he would be permitted to reenlist, but under *Perry* such an expectancy is simply not protected by the due process clause. *See Perry v. Sindermann, supra,* 408 U.S. at 602–03, 92 S.Ct. 2694. Neal claims only that he *believed* that he would serve a full career in the Marine Corps, but there is nothing inherent in defendant's conduct which would permit us to draw an inference that this belief was justified by an "unwritten 'common law'" of Marine Corps practice, *see Perry v. Sindermann, supra* at 602, 92 S.Ct. 2694, nor has Neal pointed to any other evidence that might permit us to draw such an inference.

In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) the respondent, an assistant professor with no tenure rights to continued employment at the state university where he worked, had been informed that he would not be rehired after the first academic year. Alleging that the decision not to rehire him infringed his 14th amendment due process rights, the teacher initiated an action in the district court. The court, finding that respondent's due process rights had been violated, granted summary judgment for respondent and ordered the university officials to provide him with a statement of reasons and a hearing, and the court of appeals affirmed. In reversing, the Supreme Court analyzed respondent's property entitlement claim as follows:

> Just as the welfare recipients' "property" interest in welfare payments was created and defined by statutory terms, so the respondent's "property" interest in employment as Wisconsin State University-Oshkosh was created and defined by the terms of his appointment. Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30[, 1969]. They did not provide for contract renewal absent "sufficient cause." Indeed, they made no provision for renewal whatsoever.
>
> Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

*Board of Regents v. Roth, supra* at 578, 92 S.Ct. at 2709–10 (footnote omitted).

Our analysis of Neal's property entitlement claim tracks the *Roth* Court's analysis and leads us to the same conclusion

---

**36.** These documents also reflect Neal's awareness of the manner in which the Corps undertakes this obligation.

**37.** *See* Affidavit of Col. Martin Egan, ¶ 6, attached to Defendants' Supplementary Memorandum of Law.

reached therein: the terms of Neal's enlistment secured his interest in Marine Corps service only up to December 23, 1974, and because those terms, like the terms of Roth's employment contract, made no provision for renewal, they secured absolutely no interest in reenlistment for another term, *i. e.*, they support no possible claim of entitlement to reenlistment. Nor is there any federal statute or Marine Corps rule or policy that secured Neal's interest in reenlistment or that created any legitimate claim to it. In these circumstances Neal, like Roth, surely had an abstract concern in being reenlisted, but he did not have a *property* interest sufficient to require the defendants to give him a hearing when they declined to permit him to reenlist.

### 3. *Neal's Liberty Interest Claim*

 Having determined that no *property interest* of Neal's was implicated by defendants' refusal to permit him to reenlist, we next turn to the question whether defendants' refusal implicated any *liberty interest* of his. Although the term "liberty" in the Constitution's due process clauses has never been precisely defined, the Supreme Court has emphasized that "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents v. Roth, supra* at 572, 92 S.Ct. at 2707. It is clear that a governmental attack on one's "good name, reputation, honor or integrity" may be a deprivation of liberty within the meaning of the 5th and 14th amendment due process clauses, *see Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), and that governmental imposition of a stigma or other disability that substantially forecloses a range of employment opportunities may also constitute such a deprivation. *See Board of Regents v. Roth, supra*, 408 U.S. at 573–74, 92 S.Ct. 2694.[38]

Neal alleges that the governmental action in his case constituted both the kind of reputational attack contemplated by *Wis-*

consin v. Constantineau, supra, and the kind of stigmatization contemplated by *Board of Regents v. Roth, supra*. Specifically, he contends: (1) that he had been "branded . . . as guilty of substandard conduct and as being unfit to be a Marine," *see* Complaint ¶ 24; (2) that the RE–3C designation on his DD Form 214, barring reenlistment without approval of the Commandant, "will have potentially wide circulation, including the U. S. Employment Service," *see* Supplementary Memorandum in Support of Motion for Summary Judgment; and (3) that the reenlistment code will act as a bar to any future employment with the federal government, *see* Supplementary Affidavit in Support of Motion for Summary Judgment, ¶ 2. We reject Neal's contentions for several reasons.

First, as we noted in our discussion of Defendants' compliance with prescribed regulations and procedures, *see* note 27 and accompanying text, *supra*, the EPB evaluation of Neal's case was not pursuant to its mandate to conduct "substandard review." The Board did not use "substandard conduct" criteria in Neal's case nor did it, as Neal contends, "brand him guilty of substandard conduct." What is more important, though, is that neither Neal's reputation in the community nor his standing with prospective employers is implicated by defendants' actions—unless we assume defendants will violate their own regulations, an assumption we cannot make in the absence of any evidence indicating such violations, *see Richardson v. United States*, 209 Ct.Cl. 754, 755 (1976)—because neither the community generally nor any prospective employer can be expected to know from public records of the circumstances of Neal's discharge.

The regulations and procedures governing discharge from the Marine Corps are set forth in MCO P1900.16, the Separation and Retirement Manual (MARCORSEPMAN), the relevant paragraphs of which are part

---

**38.** The Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) may have significantly narrowed the range of constitutionally protected liberty inter- ests, but for the purposes of this discussion we assume the currency of the broad interpretations of "liberty" contained in the quoted language.

of the record in this case. Neal was discharged pursuant to ¶ 6012.1f(9), and the reenlistment code RE–3C was entered on the appropriate copies of his DD 214 (MC), or discharge papers. *See* letter of November 20, 1974 to Neal from A. P. Taylor by direction of the Commandant. Paragraph 6012.1f(9) provides:

> 6012 DISCHARGE OR RELEASE FROM ACTIVE DUTY FOR CONVENIENCE OF THE GOVERNMENT
>
> 1. The Secretary of the Navy, or the Commandant of the Marine Corps, may authorize or direct the discharge or release from active duty of a Marine for the convenience of the Government for any one of the following reasons:
>
> \* \* \* \* \* \*
>
> f. For other good and sufficient reasons, not elsewhere listed in this chapter which are specified and published by the Secretary of the Navy. Those currently specified are as follows:
>
> \* \* \* \* \* \*
>
> (9) As a result of action taken with respect to the decisions or recommendations of the Naval Clemency Board, a Marine Corps Selection and Review Board, or a Marine Corps Enlisted Performance Board or other similar board.

The DD Form 214 (MC) is a standard form designed to provide a source of information relating to former personnel. It is available to the Marine Corps and other departments within the Department of Defense. MARCORSEPMAN ¶ 11001.2a. It is also available to the individual as a brief record of his tour of duty. *Id.* ¶ 11001.2b. The copy provided to the individual (which he might be asked to furnish to a prospective employer) does not contain the reenlistment code or the reason for separation, nor is this information available to government agencies or the public generally. *Id.* ¶ 11001.2b and c, 11003.5.9c.1 and 11003.5.-10; 5 U.S.C. § 552a. Thus the information contained in Neal's Marine Corps file is required by law to be kept confidential, unavailable to prospective employers or oth-

ers in the community at large, and there is no liberty interest implicated in the absence of some evidence suggesting that the defendants would make this information public in derogation of their own regulations. *See Bishop v. Wood,* 426 U.S. 341, 348–49, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Sims v. Fox,* 505 F.2d 857, 863 (5th Cir. 1974), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975). Nor can it be said that the mere presence of derogatory information in a confidential file, without more, constitutes an infringement of liberty. *Sims v. Fox, supra* at 863.

■ In short, the fact that defendants honorably discharged Neal at the expiration of his term of enlistment is the only fact that can be expected to be publicly known with regard to Neal's Marine Corps career. Because the law clearly requires some *public communication* of derogatory information or charges to form the basis for a colorable claim that a person's interest in his "good name, reputation, honor, cr integrity" has been impaired by governmental action, *see Bishop v. Wood, supra,* 426 U.S. at 348, 96 S.Ct. 2074, and because the only *publicly-communicated* information about Neal is not at all derogatory or stigmatizing, we are constrained to reject Neal's claim that defendants' actions have deprived him of the liberty guaranteed him by the due process clause.

## VI. *Conclusion*

Because we have concluded that we have jurisdiction to decide this case and that the sovereign is not immune from Neal's equitable claims, we have examined all of the non-constitutional and constitutional grounds upon which Neal urges us to hold that the actions of the EPB and the BCNR were invalid, and to require the defendants to permit him to reenlist in the Marine Corps or, at the very least, to require them to grant him a hearing before the EPB. We reject Neal's non-constitutional claims because we find that defendants' actions comported with all applicable statutes and regulations, and that they were within the

bounds of permissible agency discretion. We reject Neal's constitutional claims because we find that Neal had no protectible property or liberty interest in being permitted to reenlist, so that defendants' actions did not implicate any of his due process rights.[39] Deciding as we do that defendants' actions violated no regulatory, statutory or constitutional right of Neal's, we grant defendants' motion for summary judgment.

---

**39.** While we are constrained to hold that the defendants' actions in the instant case are statutorily and constitutionally permissible, we are of the view that procedures enabling a person in Neal's position to examine *all* materials in his record before his case is submitted to the EPB, or even to appear before that Board where, as here, serious but unproven accusations are contained in his record, would more closely comport with traditional notions of fairness, and yet would not be unduly burdensome for the Marine Corps. We suggest that the Commandant give consideration to the adoption of such procedures.